```
               UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NORTH CAROLINA
                      WESTERN DIVISION

-------------------------------------------------------

UNITED STATES OF AMERICA,

                 Plaintiff,

     -vs-                        Case No. 5:23-CR-192-M-RN-1


ERIC CHARLES WELTON,

                 Defendant.

-------------------------------------------------------

                     MOTION HEARING
                    JANUARY 8, 2024
           THE HONORABLE CHIEF JUDGE RICHARD E. MYERS II
                UNITED STATES DISTRICT JUDGE



     A P P E A R A N C E S


On Behalf of the Government

LORI B. WARLICK
United States Attorney's Office - EDNC
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601


On Behalf of the Defendant

SCOTT L. WILKINSON
Scott L. Wilkinson & Associates, P.C.
2802 Anderson Drive, Suite 101
Raleigh, North Carolina 27608



                   Risa Kramer, RMR, CRR
                   Official Court Reporter
                 United States District Court
                  Wilmington, North Carolina
```

1                     INDEX OF PROCEEDINGS

2

3  ERIC WELTON

4       Direct Examination by Mr. Wilkinson.........5

5       Cross-Examination by Ms. Warlick............16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2                (Proceedings commenced at 3:02 p.m.)

 3               THE COURT:  All right.  If the clerk would

 4  please call the case.

 5               THE CLERK:  United States of America versus

 6  Eric Charles Welton.

 7               THE COURT:  Counsel, please state your

 8  appearance for the record.

 9               MS. WARLICK:  Your Honor, Lori Warlick for

10  the government.

11               MR. WILKINSON:  Scott Wilkinson for

12  Mr. Welton, Your Honor.

13               THE COURT:  And, Mr. Wilkinson, I've read

14  your motion in limine.  It's well-founded.  I'll grant

15  it.

16               MR. WILKINSON:  Thank you, sir.

17               THE COURT:  We're here on motion for

18  reconsideration.  I'll hear you.

19               MR. WILKINSON:  Your Honor, at this time I'd

20  like to call Mr. Welton.

21               THE CLERK:  Raise your right hand and state

22  your full name for the record.

23               THE WITNESS:  Eric Charles Welton.

24               (The defendant was placed under oath.)

25               THE COURT:  Now, Mr. Welton, before you do
```

1  anything, I'm gonna apprise you of your Fifth Amendment

2  rights.  You're under indictment by the United States.

3  You have the absolute right to remain silent if you

4  choose to do so.  Your attorney has filed a motion in

5  limine to limit the scope of the testimony and the scope

6  of cross-examination in this case.  That motion has been

7  granted.

8           However, be cautious because your statements

9  may open the door to cross-examination or additional

10  questions by the United States, and I will permit them

11  some cross-examination within the scope of the

12  conversation that we're having.

13           If it turns out that you open the door,

14  there's a possibility that they might be able to ask you

15  things about the substance of your offense if that comes

16  up as part of what your attorney's conversation with you

17  discusses, okay?

18           So I just want to caution you and tell you,

19  you have the absolute right to remain silent, but that

20  right can be waived.  It's being waived now to have this

21  conversation.  And I want you to be fully apprised of

22  any risk that you might face.  Do you understand?

23               THE WITNESS:  I understand, Your Honor.

24               THE COURT:  All right.  Mr. Wilkinson.

25               MR. WILKINSON:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WILKINSON:

    Q.  All right.  Mr. Welton, you've already stated
your name.  Can you tell the Court about your family?

    A.  Yes.  Let's see.  My current relative --
immediate relative is -- living relative is my father,
Richard Welton.  He lives in Charles City, Iowa.  He is
currently living with my daughter, my adopted daughter,
Witchuda Eve Welton.

        And I am married.  My wife lives in Thailand --
Pai, Thailand.  We've been married about 18 years; so I
say roughly 20, but I think it's 18.

    Q.  All right.  And I know that you're in custody
now, but prior to being placed in custody, where were
you living?

    A.  For about the last 18 years I live in Pai,
Thailand.  It's up in northern Thailand, just south of
the Myanmar border.

    Q.  Mr. Welton, are you presently taking any
medications?

    A.  Yes.  I take a number of medications, primarily
for heart disease and a little bit for PTSD.

        The heart medication's clopidogrel, and aspirin
for anticoagulant and blood thinners; I think losartan
and amlodipine for high blood pressure; rosuvastatin for

1   cholesterol.  I believe those are the -- the heart

2   medicine.

3        And then fluoxetine and Topamax for PTSD.  The

4   Topamax is primarily to control for nightmares.

5   Q.  All right.  Are you taking those medications as

6   they have been prescribed by a medical doctor?

7   A.  Yes.  Yes.  I am taking them as they've been

8   prescribed.  The most recent prescription was updated by

9   Dr. Price at Robert A. Deyton Detention Facility.  And

10  I've been taking them as prescribed, as best provided by

11  the detention facilities.  This morning they were

12  omitted by Onslow County, so...

13  Q.  All right.  So the medications you were supposed

14  to take this morning, Onslow County did not provide

15  those to you prior to coming to court?

16  A.  That is correct.

17  Q.  All right.  Number one:  The medications that you

18  do take, do they affect your ability to understand

19  what's going on?  Why you're here today?

20  A.  Not significantly, no.

21  Q.  Does the absence of having taken those

22  medications this morning affect your ability to

23  understand why you're here and what's going on in court

24  today?

25  A.  No.

1    Q.  All right.  Do you feel like your mind's clear
2  and you understand why you're here?
3    A.  Yes.
4    Q.  Okay.  Mr. Welton, can you give the Court kind of
5  an overview of your education?
6    A.  Sure.  I graduated high school, salutatorian and
7  lots of honors and awards, class president, and all that
8  stuff.
9        Then I attended the University of Illinois at
10  Urbana-Champaign.  I was a dual-degree candidate in the
11  College of Engineering.  I started out in electrical
12  engineering.  In the College of Liberal Arts, I was a
13  philosophy major.
14        After a little bit of time, I changed my College
15  of Engineering degree to computer science where I
16  graduated with honors.  And then that was kind of my
17  backup degree.
18        In the liberal arts college, I moved to a
19  self-designed major where you put together your own
20  program, and I put together a program in a field that
21  became known as cognitive science.  And in the process
22  of putting together that program, I affiliated myself
23  with a research institute and a computational
24  neuroscience lab.  And I worked at the National Center
25  for Supercomputing Applications; worked on some

 1  technology that you now know as the worldwide web; was

 2  instrumental -- not instrumental but participatory in

 3  some of the very fundamental tools there, one of which

 4  you know as the browser.

 5       And I was also working at a computational

 6  neuroscience lab where I developed some computers and

 7  evolved a synthetic nervous system for a biologically

 8  realistic robot cockroach.

 9       And after a couple years in there, I had amassed

10  enough credits for a third degree, but I opted to join

11  the Ph.D. program at the University of California in

12  San Diego in cognitive science.

13       I left that to chase the dot-com bubble in, I

14  believe, '97, and was in the private sector then for a

15  while.

16       Around 2000, I think, I put some ideas for a

17  dissertation at the University of British Columbia and

18  was considering reentering academics at that time, so

19  that's...

20  Q.  All right.  And so what degrees do you currently

21  hold?

22  A.  I have a master's and two bachelor's.

23  Q.  And in what fields?

24  A.  Cognitive science and computer science, and then

25  the liberal arts degree titled "Information Processing

1    and Cognition Systems."

2        Q.   All right.  And you touched on it a little bit,

3    but can you give the Court an overview of your work

4    history as an adult?

5        A.   Yeah.  I'd been programming computers since 1982,

6    so I've had -- I've always had this skill, and it's been

7    timely.  And with my exposure to the early days of the

8    Internet, since before it was deregulated, I've had a

9    set of in-demand skills.  So I've always had access to

10   work; have worked for a wide variety of industries and

11   companies, and largely as a independent contractor in

12   all kinds of different modes.

13        My last standard office job was for Computer

14   Sciences Corporation in Arabia, in Saudi Arabia, and I

15   worked on biometrics, border control, and digital

16   identity system in Riyadh.  And at that time I was

17   domiciled in Thailand, so I used the -- used the

18   earnings from that to build my current home.

19        And after that, I spent about a decade working in

20   core Internet traffic routing, did some start-ups, and

21   built and sold some companies.

22        Then, when my daughter completed her A-levels and

23   moved abroad to America, I switched gears and went back

24   to digital identity and biometrics and focused more on

25   nation-states in the global South and did a lot of

digital rights activism and was active in that, right up
until the time of my detention, where I was moving to
start some new companies and kind of get them launched
and was on a -- I guess, a business launch tour in
Africa and Europe when I got detained.

Q. All right. So what you just described is the
last work you were doing before you got detained.

A. Yes.

Q. Mr. Welton, do you know why we're in court today?
Do you understand what the purpose of this hearing is?

A. Yes.

Q. Can you explain to the Court your understanding?

A. So, at the hearing on the 13th, which was styled
as an arraignment, a question was raised as to my mental
competency.

On the 15th a finding was made to look into a
4241 evaluation -- to commit me for a 4241 evaluation.

When new counsel was appointed, we took a look at
that and then filed a motion to reconsider that. And
that motion then was granted, and an order to --
granting that reconsideration was filed, I think, on the
29th, allowing this hearing. And so here we are today.

Q. All right. Do you have an understanding of how
these proceedings against you began?

A. Yes. A superseding criminal complaint was filed,

1  I believe, on the 6th of December 2022.

2        Then, while I was on a business trip, my passport

3  was revoked.  I was returned to Atlanta and arrested in

4  Atlanta.  Then a hearing redirected me to this district

5  where I was indicted.  And I've been in detention then,

6  and -- well, at Bladen and then at Onslow and...

7       Q.  Okay.  So you're talking about the different

8  jails that you've been --

9       A.  Yeah.

10      Q.  -- housed in --

11      A.  Yeah.

12      Q.  -- since you've been arrested?

13      A.  Yeah.

14      Q.  All right.  You mentioned Atlanta.

15      A.  Yeah.

16      Q.  Do you understand what happened in Atlanta?  Why

17  you were in Atlanta?

18      A.  Yeah.  I was -- I mean, I was arrested at Atlanta

19  Hartfields [sic] and then detained there.  And then we

20  had the original detention hearing, and there was a

21  motion to move me -- to move me into this district

22  because the charges related to this district.

23      Q.  Okay.  And you mentioned that you've been

24  indicted.

25      A.  Yes, in this district.

1    Q.   What does the indictment mean?

2    A.   The indictment describes the charges, Title --

3    Title 18, 115(a)(1)(B) and (e), which is threatening

4    communications.

5    Q.   All right.  And do you know what type of case

6    this is?

7    A.   It's a criminal case.

8    Q.   Do you understand the possible consequences of

9    the outcome of a criminal case?

10   A.   Well, yeah.  I'd be found guilty or innocent.

11   Q.   If you went to a trial?

12   A.   If we went to trial, yeah.  Or, I mean, we could

13   have some nontrial resolution.

14   Q.   Do you understand what entering into a plea

15   means?

16   A.   Yeah.  That would be a nontrial resolution.

17   Q.   Do you have an understanding of the consequences

18   of being found guilty if you went to trial or of

19   entering a plea of guilty?

20   A.   Yeah.  I mean, then we'd get into a sentencing

21   phase, and it would be probably either an active

22   sentence or possibly some probation, that -- the

23   possible -- the worst possible situation, if both

24   charges were -- the maximum sentence for both charges is

25   10 years each, so a total of 20 years.  And then there's

1    some additional fines and possible penalties.

2        Q.  All right.  Do you have an understanding of how a

3    sentence is determined in federal court?

4        A.  There's a -- the federal sentencing guidelines,

5    and there's -- it considers your background, criminal

6    history.  There's a baseline set of attributes for the

7    offense, and then there's a set of adjustments that

8    consider the individual circumstances and the victim.

9    And those are all considered to generate a set of levels

10   or points that are then converted into a sentence range

11   that's considered.

12       Q.  All right.  All right.  As far as the people that

13   are in court today, do you understand the role and who

14   each of the people are?

15       A.  I believe I do, yes.

16       Q.  Can you explain that to the Court?

17       A.  Well, we have the judge.  The role of the judge

18   is to preside over the courtroom, to rule on matters of

19   law, and to provide a neutral environment in which the

20   two opposing sides can have this adversarial contest.

21           You have the prosecutor which represents the

22   state and brings the charges against the accused.

23           Then we have the defense counsel.  You represent

24   the defendant, and we argue the case.

25           I don't see any representative of the -- an

investigatory arm.  But prosecution generally has some

investigatory ability to dig into the matter at hand.

Q.  Do you understand what the burden of proof is for

you to be found guilty in a criminal case?

A.  As we've discussed that, the mathematician in me

bristles at that.  I really want to say burden of

persuasion.  But, yeah, the burden of proof falls on the

prosecution.

Q.  All right.  And what is that burden?

A.  It's beyond a reasonable doubt for guilt or

innocence.  Yes.

Q.  All right.  A couple other people in the

courtroom that are sitting more near to you, do you know

who these people are?  Not personally but just the

roles.

A.  I mean, the -- a little bit confused.  I mean, I

know there's a court reporter and they take the records

and maintain the records.  But, well, I'm not exactly

sure who all three are, no.

Q.  Okay.  All right.  Do you know how I became to be

your attorney?

A.  Yes.  After some of the conflict with prior

counsel, once that was resolved, you were appointed

counsel.

Q.  All right.  Did there come a time when you were

still being represented by prior counsel that you became
either -- well, you became unwilling to work with your
prior counsel?

    A.  Yes.  Yes.  There was a breakdown in our
relationship.  And we needed to move on and dissolve
that relationship, and that was a bit bumpy.  So that's
what I think kind of led to all of this conflict.

    Q.  All right.  But that conflict has now been
resolved?

    A.  Yes.  That is correct.

    Q.  And how was that done?

    A.  It was done with the -- they withdrew, I believe,
using the matter of ethics as the trigger.  So they
withdrew from counsel and then you were appointed as
substitute counsel.

    Q.  All right.  In terms of assisting counsel, do you
feel like you are able to assist your current counsel in
preparing and presenting your defense?

    A.  I believe there's no problem there, yeah.  And in
particular, the communications issues have been
resolved.

    Q.  All right.  And how do you assist counsel in your
defense?

    A.  I provided copious documents.  I can provide
access to witnesses and information about the case as

 1   well as testify.

 2       Q.   As Judge Myers mentioned to you up front, you

 3   have a Fifth Amendment right to remain silent, but you

 4   understand that you can testify?

 5       A.   That is correct.  Yes.

 6       Q.   Finally, Mr. Welton, do you believe that you are

 7   presently suffering from a mental disease or defect that

 8   renders you mentally incompetent?

 9       A.   No.

10       Q.   Do you believe that it's necessary for you to be

11   transferred to another facility for a mental health

12   examination?

13       A.   No, I do not.

14            MR. WILKINSON:  Thank you, Mr. Welton.  No

15   further questions, Your Honor.

16            THE COURT:  Cross-examination.

17            MS. WARLICK:  Thank you, Your Honor.

18                     CROSS-EXAMINATION

19   BY MS. WARLICK:

20       Q.   Good afternoon, Mr. Welton.

21            You're aware that a competency question isn't one

22   that's questioning whether you're a smart man, right?

23       A.   Yes.

24       Q.   Or that you're an educated man.

25       A.   Right.

1    Q.  No one's suggesting that you're not smart and

2  you're not educated.

3    A.  Mm-hmm.

4    Q.  I'd like to ask you some about the letters that

5  you sent to the Court.

6    A.  Okay.

7    Q.  So what's -- what's going on in Onslow County?

8           MR. WILKINSON:  Objection, Your Honor.

9           MS. WARLICK:  Your Honor, if he'd state the

10  basis, I can respond.

11           THE COURT:  Basis for the objection?

12           MR. WILKINSON:  First, Your Honor, it's

13  beyond the scope of direct.  We didn't go into any of

14  those matters.  It has been about his understanding of

15  the nature and consequences of these proceedings and his

16  ability to assist counsel.  Those letters don't address

17  any of those issues.

18           MS. WARLICK:  Your Honor, I would disagree.

19  The letters are pretty important for us, especially

20  because they relate to the resolution of the case.  They

21  talk about that specifically.  There was even a pro se

22  motion to continue regarding this, so...

23           THE COURT:  You're talking about the pro se

24  letters that have been filed with the court?  Are there

25  other letters I have not seen?

1          MS. WARLICK:  Just the three that are on the

2    docket, Your Honor, including -- one I've called a

3    letter, but it's actually fashioned a motion.

4          THE COURT:  Okay.  Out of an abundance of

5    caution, I'm not gonna have him testify regarding them.

6    They are before the Court and I will consider them and

7    I'll take argument on them.

8          To the extent that there are specific lines

9    in the letters that you believe demonstrate cognitive

10   distortion, I will permit you to read those and ask him

11   what he understands them to mean.

12         MS. WARLICK:  Thank you, Your Honor.  May I

13   just have a moment, then?

14   BY MS. WARLICK:

15   Q.   Okay.  In your letter that's docket entry 26,

16   which is one that you signed on -- or it was submitted

17   back in November, you were talking about the candor --

18   your candor being greater than that of those of us that

19   are officers of the court.

20   A.   Could you please read the line, please?

21   Q.   Sure.  "I'm concerned with clarifying the record,

22   perhaps even more than the final disposition of this

23   matter.  The reason for this may seem odd, but where the

24   defense and the prosecution's duty of candor is limited

25   to the court, I perceive my duty of candor to extend

1   much further and I understand my role is far more

2   significant."

3        What do you think your role is?

4   A.   The -- what I'm particularly concerned with there

5   is the -- when I became aware of the conditions of --

6   the conditions of the record regarding my detention; for

7   example, the statement that my daughter lived in

8   Thailand, which is just false.

9        These records are increasingly subject to digital

10  recording, mining, and extrapolation.  When I approached

11  and discussed correction about how that might be

12  rectified so that that was just recorded as not being

13  true, as being in error, there seemed to be no

14  mechanism.  The statement that was continually told to

15  me was, "That wouldn't change anything."

16       And to me, that wasn't important, whether it

17  would or wouldn't change the outcome of a detention

18  hearing.  The fact that it was recorded on the record

19  and was wrong was in and of itself enough of a problem

20  for me.  I wished that to be rectified.  And the fact

21  that the officers of the Court with whom I was

22  discussing this continually said, "But that wouldn't

23  change anything, that wouldn't change," as they said --

24  and I don't want to speak for the judge, but they said

25  it wouldn't change the judge's behavior or the judge's

ruling on this.  I said I -- that, to me, wasn't
important.  The fact that it was written in the record
and it was false, I felt there should be some addendum,
just some statement saying this was found to be false,
that would be enough because that will live in
perpetuity.

     Whether or not I am found to be guilty or
innocent is immaterial to the fact that the record
exists and has a false statement in it.  As long as
there was some correction to that record, I would be
satisfied.  Again, whether I'm found guilty or innocent
to me was immaterial, as long as the record -- it
contained an adjustment to that fallacious entry.
That's all that I meant by that.

    Q.  Okay.  And I'll tell you -- is that the only
mistake that was in the documents from the detention
hearing?

    A.  No.  There are quite a few.

    Q.  What else was there?

    A.  I would have to go through -- do I have that one
up here?  Do I have that -- it's docket -- docket
entry...

    Q.  15 --

    A.  15, attachment 4, I believe.

    Okay.  That I have "a valid visa to live in

Thailand."  If -- I believe that visa was no longer
valid at the time.

     "My wife and child are Thai and live in
Thailand."  My daughter is an American citizen, and she
lived at the time in Austin, Texas.  In fact, I was
working -- okay.

     "My wife was recently denied a visa to visit the
United States, which was the cause of my anger towards
the U.S. Consulate."  That's not true.

     "So she cannot come here while his case is
pending."  There is some additional documentation that
is relevant and missing that might change the nature of
that, which I felt was worth discussing with prior
counsel.  At the time, I was not able to do that.

     "He was traveling through multiple countries in
Africa."  That's not true.

     "When he was refused an entry to an African
country because his passport had been revoked."  I
wished to clarify that.  And this is another issue.  I
was trying to obtain access to the passport which was
seized in Osaka, which was a point of great contention
with prior counsel.

     "I had recently taken a long trip to the U.S.
during the pandemic to see his father."  That is an
issue that needs some clarification as well.  It's an

odd statement relative to the circumstances.  But again,

I don't believe -- let's see.

"So he may flee there."  One of the things that I

had discussed -- "flee" is a bit odd in that context.  I

had attempted to discuss with counsel at that time if

there were possible conditions of detention, of house

arrest, actually in Iowa, which I don't think "flee"

would be the right thing.

Yeah.  Let's see.  "He was somehow managing to

travel through multiple countries in Africa on a revoked

U.S. passport."  That's fallacious.

So, "which shows knowledge of how to navigate

international borders without a valid passport."  I

don't believe that that statement is accurate.

And possibly some concern about the

characterization of junk -- junk e-mails is something

I'd like to possibly delve into.

But those are several of the statements that I

think would, under analysis, have warranted an

investigation.  But what I had hoped would come of it is

exactly a careful, mediated, sensible discussion of the

matter rather than anything else.  I felt that these

things needed to be corrected, whether or not they would

actually change the fact of my detention.  That's what I

had hoped to convey, that it was my commitment to having

```
 1   those corrected, without regard to the changing of my --
 2   the fact of my detention.  My motivation was not
 3   necessarily to change my detention or to have them speak
 4   to my guilt or innocence.  But those were all things I
 5   felt were misstated or they painted a picture that were
 6   quite different from what I think were -- were the
 7   actual facts.
 8       Q.  So you also stated in this letter, you -- this is
 9   a longer sentence, so let me -- bear with me, please.
10       A.  Certainly.
11       Q.  "Where the prosecution and defense are mere cogs
12   in the machine of the court it is the role of myself and
13   the party alleging insult to sculpt the character of our
14   nation and routinely advance the cause of human
15   interest."
16           And there's a next sentence.  "We, the
17   defendants, are the women confined to the second tier of
18   society, the illegal lovers and bachelor companions
19   never recognized, the three-fifths of a person under the
20   policeman's boot."
21           What do you mean by that?
22       A.  Do you recognize each of those references?
23       Q.  Some of them, not all.
24       A.  So there is a great machinery at work here, and I
25   think this is a part of it.  This is -- this 4241
```

hearing is a piece of the machinery in action.  And
there's a great deal to be said for it.  I mean, it's
what makes this process work.

On the other hand, there's arguments that need to
be had.  I don't know how familiar -- am I permitted to
ask a question?

THE COURT:  Not right now.  You can confer
with -- your counsel may redirect you if necessary.  But
right now...

THE WITNESS:  Okay.

THE COURT:  To the extent you can, please
explain -- I understand the references, the
constitutional references.

THE WITNESS:  So what this -- what this --

THE COURT:  19th, 14th -- I understand the
references as constitutional references.

THE WITNESS:  Well, the -- the -- what this
speaks to is the issue of consular nonreviewability,
which shields the discussion of certain issues, such as
what happened in the consulate.  There is no legal
remedy to address the actions in the second charge.
There's no vehicle by which to have that -- the
conversation.

This is an opportunity to have that
conversation, and it speaks to one of the values of

having these proceedings.  Again, whether or not I'm

ultimately found guilty or innocent, I believe that

there's incredible value in a conversation and in the

generation of a record where issues that are otherwise

shielded and hidden through consular nonreviewability

can be brought to light, and --

BY MS. WARLICK:

Q.  Do you think that this Court has the ability to

change consular nonreviewability?

A.  I do not believe that this Court has the ability

to change consular nonreviewability, but I do believe

that this Court has the ability to record an official

record of a discussion about consular nonreviewability.

Q.  Even though consular nonreviewability is not

really an issue in the charges.

A.  It is not a -- it is not referenced in Title 18,

Section 115(a)(1)(B).

Q.  Right.  What would you like to say about consular

nonreviewability?

A.  I do not think this --

MR. WILKINSON:  Object --

THE WITNESS:  -- is the time to --

MR. WILKINSON:  This is --

THE COURT:  Sustained --

THE WITNESS:  -- discuss that.

          THE COURT:  Sustained.  You don't answer the

question.

BY MS. WARLICK:

   Q.  You submitted a couple other documents to the

Court.  I'm just gonna ask you about a couple of

statements in those, please.

          You talk about your non-counsel defense network.

Who is that?

          MR. WILKINSON:  Your Honor, can I get a

reference to what --

          MS. WARLICK:  I'm sorry.  He mentions it in

several letters, but I'm referring specifically to page

1 on document 29.

          THE WITNESS:  During the -- during the July

to November period, I struggled to get information about

my case.  And when I was unable to get information about

my case, I had to reach out to friends and family to get

information.  And so, yeah, the word just started

spreading that I needed help, I needed access to

information.

          So through PACER records, people who had

facility with computers were able to find, through PACER

databases and other sources like that, they were able to

start to gather information.  Some of that information

they attempted to send to me through the United States

Postal Service but that was blocked, incoming, by Onslow

County Sheriff.

BY MS. WARLICK:

Q.   You talk about in document 29 corrupt law

enforcement and the U.S. Marshals in Georgia "expressed

a desire to effect my execution pretrial via third party

and with complete plausible deniability."

A.   Correct.

Q.   Who are those people?

A.   The statement that was made, I believe, was,

"Gosh, it would be so great if we could just kill you

and get rid of your body and then get rid of all this

paperwork."  And it was a particular Marshal.  It was --

I think I said May 30th but I believe it was May 31st.

I didn't have a -- my dates may be off by a day.  But,

yeah, that was -- that was the statement made.

      And then there were some additional statements

made about ways they could do that, basically by calling

up friends in other agencies.  I don't believe it's a

broad conspiracy or anything persecutory.  I think that

was just somebody who -- that was rubbed the wrong way

and wanting to intimidate me and communicate threatening

sentiments to me.

Q.   Communicate threats?

A.   I believe that because it was relevant to my

case, I think it bears discussion in this context. But yeah, it was a -- it was a Marshal. I didn't get his name.

There was some problem booking me, so it was the same -- and just today while I was in -- in the holding cell, they had a problem. There's an HID device where they take biometrics. And Marshal Winters, I believe, was having problems booking somebody today and had frustrations because it failed, the machine failed. And as he walked by, I said, "Hey, did you have problems booking somebody?" I said, "That was the same machine that caused the frustration in the Marshal that threatened to kill me." And he said, "Well, that's a bit extreme." I said, "Yeah but, you know, it's -- it was extreme."

But it was that same device. And it was failing and repeatedly failing, and it caused me to be brought repeatedly into the courtroom in Georgia.

And on the third and final day, the day after my booking -- I mean after my hearing, after that happened, that the frustration had grown so great that the Marshal did make those comments.

And then there's some additional context surrounding that, specifically surrounding medication. And at the end of that day, I did wind up on a stretcher

```
 1   and was in the emergency medical care that day.  Yeah.
 2      Q.   Okay.
 3                THE COURT:  I would like some follow-up on
 4   that.  You say the context was surrounding medication,
 5   and you ended up in emergency medical care.  Did
 6   somebody overmedicate you?  Fail to medicate you?  What
 7   happened?
 8                THE WITNESS:  During medical intake I --
 9   during medical intake, the -- when I came in, I had
10   planned to go on about an eight-week trip, so I had
11   eight weeks of medication with me.  And when I came in,
12   that medication was catalogued and then promptly
13   forgotten.
14                The -- bear with me a little bit, if you
15   can.  I've written these details down several times.
16   I've communicated them to prior counsel, current
17   counsel.  We're having trouble obtaining the first
18   versions of those documents from prior counsel.  Any
19   assistance from the Court in doing that would be greatly
20   appreciated.
21                Current counsel has another version of those
22   documents and I'm reassembling them from memory right
23   now, so I may miss some of the details, so -- and
24   please, if I -- if I don't get them right...
25                THE COURT:  You don't have to be perfect.
```

1     It's the best of your recollection today.

2                THE WITNESS:  Right.  Because they have been

3     written down, and the -- so on that day, the short and

4     the long of it is I was transitioning from

5     benzodiazapines to Topamax at the direction of

6     Dr. Price.  And as I was doing that, I was going into

7     benzodiazapine shock, and this is what led to -- because

8     I had just been forcibly withdrawn from benzodiazapines

9     because they had forgotten to process me at the

10    detention facility, even though I submitted a sick call

11    every day and they said, "Yeah, yeah, we'll see you.

12    Yeah, yeah, we'll see you.  We'll have a doctor look at

13    you."  They had just forgotten and -- for whatever

14    reason.  I never saw a physician.  I never saw a

15    psychiatrist.  And a psychiatrist is required because of

16    the PTSD medications.

17                So, and because nobody ever looked at my

18    medications, even though I had them and I had the

19    prescriptions and everything, I went into shock.  And

20    when I was in there in shock, that caused an emergency

21    consultation with Dr. Price.  And once -- that's when I

22    -- he gave me the -- kind of a -- an emergency

23    prescription.

24                Once I kind of recovered from that, that's

25    what got me on this -- the Topamax.  But the emergency

prescription that he wrote down was a stair-step

protocol, which -- this is actually important for

something a little bit later on, but -- it actually gets

into a -- kind of a -- a very complicated nightmare that

we're still dealing with to this day because the

medication issue hasn't been resolved completely.

But, yeah. At the end of the day, we got

onto a safe medication regimen by, say, June 1st, and

then we had stabilized and were in, kind of, a very

productive and stable medication solution by June 10th.

That was -- it was good. We had a very -- everything

was okay by June 10th. And that got messed up again

when I moved to USP Atlanta and there was a clerical

error with the Marshals again, and we haven't recovered

from that yet, so...

THE COURT: Thank you, sir.

MS. WARLICK: I just have a couple more

questions, Your Honor, if I may.

BY MS. WARLICK:

Q. At Onslow County, when they're giving you your

medicine, when do you take it?

A. In the morning and at night.

Q. And at night, both. Okay. Did you get your

medication last night?

A. Yes.

1    Q.   Okay.   There's only one other thing I wanted to

2    ask you about from what you filed, and that's about the

3    partnership.   You referred in document 29 that -- or,

4    excuse me -- document 26, that there's a partnership

5    between your former counsel, Dysart and Willis, and

6    myself -- I'm Lori Warlick, if you don't know --

7    authoring a work of fiction as -- it will purchase your

8    freedom with a currency of lies.

9    A.   Right.

10    Q.   What does that mean to you?

11    A.   What that means to me is I believe that I have a

12    unique perspective on the events, and that I should have

13    some input or somebody should ask me questions like,

14    "What happened?"   And that I should not be told what

15    happened, that I should have some input or people should

16    ask me questions about it.

17    Q.   Which people?

18    A.   Prior counsel.

19         I understand that you have a theory of the case.

20    But, for example, I -- it's very, very important to me,

21    the -- the path home.   The events in charge number 2 are

22    very, very important to me, even though they're less

23    important, perhaps, to the Eastern District.   I need to

24    understand how they both play together.   And I felt that

25    having those facts explained to me and having huge areas

just discounted and being told what was important, what
was not important, was unacceptable; that I needed to
understand how the case, the jurisdictions, and
everything played together rather than just being told
what I was supposed to believe and what didn't happen.

Some things very important happened at the
consulate, and they need to be in the record. Again,
whether there's -- I'm found guilty or innocent to me is
more important -- is less important than whether those
facts are recorded in the record. And to be told that I
just have to ignore them and pretend they didn't happen
is not something I can live with.

MS. WARLICK: No further questions, Your
Honor.

THE COURT: Redirect.

MR. WILKINSON: No, Your Honor. Thank you.

THE COURT: Thank you, sir. You may step
down.

MR. WILKINSON: Nothing further from
Mr. Welton, Your Honor.

THE COURT: Ms. Warlick, does the United
States wish to put on any evidence?

MS. WARLICK: No, Your Honor. Just what's
already been filed.

THE COURT: Okay. Mr. Wilkinson, it's your

1    motion.  I'll hear from you.

2         MR. WILKINSON:  Your Honor, just a couple

3    things.  And I've already provided the court reporter

4    with some of the cases I want to refer to, so I won't

5    spell each of them.  But the principal case that I've

6    relied on, and they all basically cover the same ground,

7    is United States versus Bernard, 708 F.3d 583.  It's a

8    Fourth Circuit case from 2013.

9         Where we are is, in my view, kind of a

10   rehearing of the reasonable cause standard under

11   4241(a), and whether the Court believes that Mr. Welton

12   is presently suffering from mental disease or defect

13   that renders him minimally competent to a point, to an

14   extent.  One is that he's unable to understand the

15   nature and consequences of these proceedings, and the

16   second is unable to assist counsel in preparing and

17   presenting his defense.

18        That determination, as a lot of others, are

19   left to the sound discretion of the Court because you

20   have the ability to -- to make a more informed decision

21   about a defendant's competence or incompetence.

22        There are in Bernard and a number of the

23   cases that are cited in there, they talk about how

24   reasonable cause can be determined or established.

25   Basically four different areas.  One is the behavioral

history, evidence of irrational behavior, which I take

from the Court's order, really, referred to the letters

and some of the passages that were read today to

Mr. Welton.

I tried desperately to find out because I

wasn't present at the hearing on December 13th -- I

tried to find out from every source I could possibly

talk to. Ms. Warlick wasn't there. I talked with

Charity Wilson who covered the hearing for her. I

talked with the court reporter, Ms. Kramer, and I

attempted on any number of occasions to talk to prior

counsel, and to this day have no idea what the Court was

told or what prior counsel represented.

But I take it from the order that not only

the nature of the charges themselves but the letters

caused the Court some concern.

I will have to say I met with Mr. Welton a

number of times. I do think there's an aspect of some

of his letters that's based on the kind of theory that

loud noises get heard. I think the southern version of

that is probably "The squeaky wheel gets the grease."

To the extent that making outlandish claims and

statements get heard, get someone's attention, is a

theory that a lot of people ascribe to. It stands in

stark contrast to the decorum in a federal court, the

way that attorneys and even defendants are expected to
conduct themselves.  So when you see outlandish
statements and flowery language that Mr. Welton used in
some of those letters, it does cause some concern.

So I've tried to really focus on what I
perceived to be the Court's concerns and tried to
address those.

The other factors, Your Honor, really, the
next one is the defendant's demeanor in court.  From
what I understand, this is really the only time the
Court's been able to hear and listen to Mr. Welton
himself.  And I wanted the Court to have that
opportunity, firsthand observations of him and how he
responds to questions and how he kind of thinks through
things.  It's different from the way that I think.  As a
trained attorney, I think a certain way.  I think all
the attorneys probably do.  Given his background, his
education, his training, his work history, he thinks
about things differently, he processes things
differently.  There's nothing wrong with that.  It's
just different.  And I think that's a lot -- in terms of
an explanation -- a lot of what goes into explaining
some of the things in those letters.

The third, Your Honor, is medical opinions,
which we don't have any in this case.

1          And then the last is the attorney's

2   representations concerning his client's competency.  All

3   those are mentioned in <u>Bernard</u>.

4          Your Honor, I've met with Mr. Welton a

5   number of times.  My first meeting -- well, I filed my

6   notice of appearance on December 19th.  I met with him

7   on December 21st, December 28th, January 2nd, January

8   5th, and January 6th.  I have over ten hours of just

9   meeting with Mr. Welton to discuss this very issue.  I

10  don't have discovery yet.  I'm not complaining about it.

11  But my focus since I got involved in this case was to

12  deal with this competency issue.  So I've met with him a

13  lot and dealt with him a lot.

14          I understood -- I mean, I read the letters

15  and it raised questions for me as well, not just the

16  nature of how he wrote things but the substance of it.

17  I heard all the stories and his explanations before.

18  They are lengthy, which is why I didn't really want to

19  get into them, because evidence of irrational

20  behavior -- and I'm not arguing that it's rational or

21  irrational.  Just assuming it is irrational I don't

22  think is an important of a function for the Court as

23  having the opportunity to view him and to listen to him

24  and how he responds to questions and how he recollects

25  events and dates and things that happened.  If he

believes that someone -- if he subjectively believes that someone had threatened him, then he wrote about it. I said in my motion that the comment about him considering those matters more important than perhaps a resolution, the same went to his -- his personality that prioritizes truth over a lot of other things. I don't find any fault with that. But again, the way he expressed it is different from the way attorneys would express it, maybe different from some of the language that we would use. But I don't find any fault in why he was having an -- why he was making a statement.

But again, I'd ask the Court to focus more on your personal observations of him than necessarily the assumptions that we can make from the letters and how he wrote stuff.

Your Honor, the last thing -- well, two things. His testimony here in court today, I'd submit to the Court that he exhibited competence by demonstrating not only an understanding of the nature and consequences of these proceedings but also how he can assist counsel in preparing and presenting his defense, and he did it with clear, concise answers. Some of his answers to the questions that the government posed to him required more of a background, but otherwise he answered every question in clear and

1   concise ways.

2           The last thing I'd like to mention to the

3   Court, there is a Supreme Court case, <u>Godinez versus</u>

4   <u>Moran</u> -- G-O-D-I-N-E-Z, versus Moran, M-O-R-A-N -- 509

5   U.S. 389 (1993), where the Supreme Court says, and I

6   quote, "The legal test for competency is whether the

7   defendant has sufficient present ability to consult with

8   his lawyer with a reasonable degree of rational

9   understanding and whether he has a rational as well as a

10  factual understanding of the proceedings against him,"

11  end quote.

12          And then the Court went on to say, quote,

13  "This formulation focuses on a particular level of

14  mental functioning, and a defendant's understanding of

15  the proceedings is the crucial component," end quote.

16          Your Honor, again, from the questions that

17  were presented to him, the answers that he gave, I don't

18  have any doubt.  I ask the Court to also find that he

19  has a clear and concise understanding of the nature and

20  consequences of these proceedings, not just today but

21  the criminal case in total.  He has demonstrated through

22  his answers an ability to not only understand how to but

23  to be able to assist his current counsel in presenting

24  his defense.

25          Under those circumstances, Your Honor, I'd

ask the Court to find that there is not a reasonable

cause to question his mental competence.  Thank you,

Your Honor.

                THE COURT:  Thank you, counsel.

                I'll hear from the United States,

Ms. Warlick.

                MS. WARLICK:  Thank you, Your Honor.

                First of all, I kind of have to say this

feels a little bit more like the kind of hearing we

would likely have after Butner rendered its analysis.

The statute says that the Court shall order the

defendant's competency evaluated upon his own -- the

Court's own, sort of, realization or finding of

reasonable cause.  So once that reasonable cause is

there, it's only an evaluation that's happening.  It's

sending the defendant for an evaluation, and the doctors

at Butner could very well come back and say, "We have

this issue or that issue, but ultimately he is

competent," and then we proceed.

                So it doesn't provide -- the statute, to me,

doesn't really contemplate a -- a large breadth of

opportunity for the defendant to try to challenge when

-- reasonable cause when the documents are already in

the record, are at least part of the information that's

giving the Court this reasonable cause to believe that.

 1          Now, that said, I do think that there's

 2    reasonable cause here.  I do think the three pro se

 3    filings are sort of illustrative of the defendant's

 4    state of mind right now.  I'm not playing any of the

 5    evidence from the underlying charges because, again, as

 6    counsel stated -- mentioned, he doesn't have the

 7    discovery yet.  And you've already, Your Honor,

 8    precluded the cross-examination of the defendant.

 9          But I will say that there's -- I will

10    proffer that there's some consistency in terms of the

11    defendant's feeling that "If you're not with me, you're

12    against me," and that because he wasn't -- he thinks

13    everything is personal, that -- and that it leads to

14    somewhat of a hyperfixation on those issues which makes

15    me concerned, reasonably concerned about the ability to

16    assist his counsel.

17          He's obviously educated and smart, but I

18    don't know that there's -- I don't know that the doctors

19    at Butner would find him not competent.  But the

20    question -- that's not a ripe question before the Court

21    right now.  It's simply the reasonable cause.  And I

22    think Your Honor already explained that in the order you

23    entered, that as a -- I will say as in the criminal

24    complaint, some of the quotations from the threats that

25    were -- that we've alleged he committed against public

officials, that, for example, being inundated by e-mails
means someone is inundating him specifically, purposely,
with e-mails. And now, you know, the county jail is
purposely doing something to him; the defense attorney
that previously represented him was wronging him. And
so I'm not -- I'm not assured that we won't be back here
again soon.

So that's why I would -- have opposed this
question or, at least, been supportive if I had been
able to attend the December hearing. Thank you.

THE COURT: Thank you, Ms. Warlick.

MR. WILKINSON: Your Honor, may I briefly?

THE COURT: You may.

MR. WILKINSON: Your Honor, three things.

Number one, I think this is exactly the type
of hearing that should have been held on the 13th. It
wasn't.

The other thing is this is not a costless
effort for the defendant. He's gonna go away for some
period of time. There's gonna be rescheduling of a
competency hearing. That's gonna take some more time.

Just from a guideline standpoint, Your
Honor, we received a copy of the plea agreement that the
government sent to prior counsel and the stipulations
that were in there. And what I'm about to say doesn't

take into account 3553(a) factors, departures, issues, that kind of stuff. Just based on the guidelines, his base offense level is a 12. If you account for all of the enhancements that go into it, he ends up being at a 14 with a criminal history category of I.

If you add a zero-point offender reduction, then he's a 12. Base offense level -- or total offense level of 12 and criminal history category of I. That results in 10 to 16 months.

He's already been in custody for seven and a half months. The 23rd of this month will be eight months. Given the nature of the hearing, who knows when he's gonna actually go to Butner, but once he gets there, that's a month, 30 days that the Court has. And then there's the scheduling and all those issues.

So it's not costless in the sense that his entire guideline range, at least, can be eaten up by this process alone.

So there is a consequence to the defendant and a reason for him not to go. But again, the legal standard, the legal test that the Court has to analyze is whether he's suffering from mental disease or defect that affects two things: his ability to understand the nature and consequences of these proceedings, and his ability to assist his counsel. And on those terms,

which are the only terms I submit the Court should be
considering, his testimony today, your observations of
him, his responses to the questions that he's asked,
show that he is able to do both of those things.

Thank you, Your Honor.

THE COURT:  Thank you, counsel.

MS. WARLICK:  Your Honor, may I have one
brief moment?

THE COURT:  You may.

MS. WARLICK:  My concern is not sending the
defendant to be evaluated for something that reasonably
is warranted renders any other hearings void -- or
voidable, if you will -- and we're gonna end up on
appeal that he should have been found not competent or
that his plea was, you know -- if I stood up in an
arraignment right now and said "Do you have any reasons
to doubt the defendant's competency or ability to enter
a plea," I'd have to say "yes."

So I understand you're in a rock and a hard
place -- between a rock and a hard place, Your Honor.
But I'll also point out that the two standards
mentioned -- that the defendant must be able to
understand the proceedings and be assistant with
counsel, it's an "or," he's got to be able to do...

THE COURT:  I understand.

 1              MS. WARLICK:  Thank you, Your Honor.

 2              THE COURT:  I'll work backwards.  As to the

 3    issue of voidability of future proceedings, the

 4    defendant has come in and made these arguments before

 5    the Court.  For him to come back later and argue that

 6    the Court was wrong in light of his own arguments I

 7    think raises serious questions of waiver, and the

 8    Fourth Circuit would not look kindly on that.  Nor would

 9    I.  So I think that the question then becomes -- I will

10    tell you that the reason that I was concerned before is

11    post-traumatic stress disorder, nature of the charges,

12    and statements within the letters that in some light can

13    be construed as paranoid, and then a motion to withdraw

14    by counsel because this defendant alleged that there was

15    a conspiracy between the government and counsel against

16    him.  With all those things before the Court, that was

17    the basis for the Court's initial order.

18              The hearing today has persuaded the Court

19    that as he sits here today, I no longer have reasonable

20    cause to believe that he may be presently suffering from

21    mental disease or defect rendering him mentally

22    incompetent to the extent that he is unable to

23    understand the nature and consequences of the proceeding

24    against him or to assist properly in his defense.  As we

25    sit here today, and under his current medication regime,

1    it appears to the Court that he has been able to fully

2    interact with Mr. Wilkinson, his current counsel, that

3    he understands the nature of the proceedings, he

4    explained them to the Court adequately.  I've had

5    defendants in here who I think are much closer to that

6    margin.

7              None of this is to suggest anything beyond

8    the nature of this hearing today.  And I'm sure there

9    will be conversations as to guilt or innocence and his

10   mental state perhaps at the time that he engaged in the

11   behavior he engaged in.  Those are separate questions

12   from his capacity as we sit here today.

13             I find that Mr. Wilkinson has presented

14   sufficient evidence to the Court today to warrant

15   reconsideration.  The Court stayed the prior order

16   pending this hearing.  On the basis of the hearing that

17   took place today, I find that defendant has demonstrated

18   to the Court that he is able to understand the nature

19   and consequences of the proceeding against him and I

20   accept Mr. Wilkinson's statements that over the course

21   of ten hours of meeting with Mr. Wilkinson, that that

22   relationship is sufficiently intact, that he is able to

23   sufficiently assist in his defense.

24             Now, that's just competency.  There's a lot

25   of road from here to the ultimate resolution of this

```
 1   case.  And I want to be clear what the Court's ruling is
 2   today.  Now, Mr. Wilkinson, I'm accepting your position
 3   as an officer of the Court that those ten hours have
 4   been sufficiently productive, that you have no concerns.
 5   Is that correct?
 6               MR. WILKINSON:  Absolutely correct, Your
 7   Honor.
 8               THE COURT:  All right.  I will not order him
 9   evaluated.  I particularly note the nature of the
10   consequence of having him evaluated can often involve 90
11   to 120 days, which would take him into the meat of what
12   the Court now understands to be a potential guideline
13   sentence, and I don't want to risk that to the
14   defendant's detriment.  It does place a thumb on the
15   scale.
16               Anything further, Mr. Wilkinson?
17               MR. WILKINSON:  No, Your Honor.  Thank you.
18               THE COURT:  Anything further, Ms. Warlick?
19               MS. WARLICK:  No, Your Honor.
20               THE COURT:  All right.
21               (Proceedings concluded at 4:04 p.m.)
22
23
24
25
```

1          **C E R T I F I C A T E**

2

3       I certify that the foregoing is a correct

4 transcript from the record of proceedings in the

5 above-entitled matter.

6

7 /s/Risa A. Kramer                3/26/2024

8 Risa A. Kramer, RMR, CRR         Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25