1

2

3

4

5

6          The following is the PDF of an official transcript.

7   Official transcripts may only be filed in CM/ECF by the Official

8   Court Reporter and will be restricted in CM/ECF for a period of 90

9   days.  You may cite to a portion of the attached transcript by the

10  docket entry number, referencing page and line number, only after the

11  Court Reporter has filed the official transcript; however, you are

12  prohibited from attaching a full or partial transcript to any

13  document filed with the Court.

14

15                    **Stenographic Reporter note:**

16          **No AI technology was used in the preparation of the**

17          **Official Certified U.S. District Court Transcript**

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


UNITED STATES OF AMERICA          )          Docket Number
                                  )          1:23-MJ-00510-RDC-1
                                  )
                    Plaintiff,    )
                                  )
              v.                  )
                                  )          Atlanta, Georgia
                                  )          May 30, 2023
ERIC CHARLES WELTON               )
                                  )
                                  )
                    Defendant.    )


                  TRANSCRIPT OF DETENTION HEARING (FTR)
                BEFORE THE HONORABLE REGINA D. CANNON
                  UNITED STATES MAGISTRATE JUDGE


APPEARANCES OF COUNSEL:


FOR THE GOVERNMENT:          MR. GREG RADICS


FOR THE DEFENDANT:           MR. STEPHEN JOHNSON


OFFICIAL COURT REPORTER:     ALICIA B. BAGLEY, RMR, CRR


 Proceedings recorded by mechanical stenography, transcript produced
                              by FTR

<u>P R O C E E D I N G S</u>

1

2      (in Atlanta, Fulton County, Georgia; May 30, 2023; all parties and

3      defendant present)

4      THE COURT:  Good morning everyone.  We're here for a

5 detention hearing and this is a case that's actually a removal and the

6 case is set in the Eastern District of North Carolina.  Let me check

7 so I get the case number correct.  I believe ours is --

8      Phyllis, where's our number?  Thank you, Dear.

9 1:23-MJ-510.

10      Will the parties please make their appearances beginning

11 with the government.

12      MR. RADICS:  Good morning, Your Honor.  Greg Radics for

13 the United States.  Sitting with me is Special Agent Corey Zachman

14 from the FBI.

15      THE COURT:  Good morning.

16      MR. JOHNSON:  Good morning, Your Honor.  Stephen Johnson

17 on behalf of Mr. Eric Welton.

18      THE COURT:  Good morning.

19      And, Mr. Welton, again, you're here, sir, because the

20 government has filed a motion for detention and they're asking to keep

21 you in custody while the case is pending.

22      Mr. Radics, I'll hear from you, sir.

23      MR. RADICS:  Your Honor, if I can make a short

24 statement --

25      THE COURT:  Yes, sir.

1      MR. RADICS:  -- about what we expect to show at this

2  detention hearing.  Our arguments are based mainly on the detention

3  motion we filed and we have a witness we're going to call.

4      Our arguments are, number one, the defendant is a serious

5  risk to flee due to many, many things that lay a lot of the mountain

6  of the bond motion.  We're going to have testimony on them.  That he

7  lives in Thailand.  He has had his visa revoked.  He has family in

8  Thailand.  He's facing a very serious charge.  He has the ability to

9  navigate borders and travel to different countries.  So we'll flesh it

10  out in the hearing.

11      But, second -- the second argument is that there's a

12  serious risk that the defendant will threaten or intimidate

13  prospective witnesses.  He's charged in North Carolina with doing

14  exactly that, and we'll flesh that out more with our witness.

15      Those are the two arguments we're proceeding on, the risk

16  of flight and the risk to intimidate or threaten prospective

17  witnesses.

18              THE COURT:  Okay.  Thank you, sir.

19              MR. RADICS:  And we would call Corey Zachman from the

20  FBI as our witness.

21              THE COURT:  Sir, you may approach and be sworn, please.

22                      (witness was sworn)

23              THE CLERK:  Please be seated and state and spell your

24  name for the record.

25              THE WITNESS:  Yes, ma'am.  My name is Corey Zachman.

1    C-O-R-E-Y.  Last name is Z-A-C-H-M-A-N.

2                        DIRECT EXAMINATION

3    BY MR. RADICS:

4    Q.  Good morning.  Are you a special agent with the Federal Bureau of

5    Investigation or FBI?

6    A.  Yes, I am.

7    Q.  How long have you been employed as an FBI agent?

8    A.  Approximately 10 years.

9    Q.  And during the course of your employment have you had the

10   occasion to investigate cases involving threats or -- threats of

11   violence?

12   A.  Yes, I have.

13   Q.  And did you become involved in an investigation involving Eric

14   Charles Welton --

15   A.  Yes.

16   Q.  -- as part of your duties?

17            And when did that investigation begin, approximately?

18   A.  Approximately September of 2021.

19   Q.  And what was the basis of that investigation?

20   A.  I first became involved in that investigation due to a bomb threat

21   that was called into a senator's office.  He had a local office in

22   the Hendersonville, North Carolina courthouse.  I'm a Special Agent

23   Bomb Tech with the FBI so I responded out to the bomb threat where

24   they closed the courthouse down and there was a message left on the

25   voicemail with that bomb threat.

1  Q. Of a U.S. Senator in North Carolina?

2  A. Yes, that's correct.

3  Q. What was the name of that senator? Do you recall? Was it Thom

4  Tillis or was it Senator Burr?

5  A. It was -- I can't remember which one has their office in

6  Hendersonville, I apologize. It was either Senator Burr or Senator

7  Tillis.

8  Q. Okay. So there was a threat at a senator's office?

9  A. Yes.

10 Q. And was that alleged threat recorded?

11 A. Yes, it was.

12 Q. And did you have an opportunity to listen to that threat?

13 A. Yes, I did.

14 Q. And based on that threat -- well, let's talk about other threats.

15 Were there any other alleged threats that came about during the

16 course of your investigation?

17 A. Yes. So that threat led me to coordinate with the United States

18 Capitol Police and they had received about the same time similar

19 threats to Senator Burr's office and Senator Tillis' office. Senator

20 Tillis' office in Raleigh, North Carolina and Senator Burr's office I

21 believe was in Greensboro, North Carolina or Winston-Salem, around

22 there, and they said that they had similar threats and they passed

23 those recordings to me as well thinking it might be the same person.

24 Q. Okay. Were those recordings -- you listened to those recordings?

25 A. Yes, I did.

1  Q.  In any of those recordings was the person who was allegedly

2  making the threats identified?

3  A.  In the one to Senator Burr, which was September 9th or 7th, around

4  that same timeframe, the email address ewelton.gspy@gmail.com was

5  used by the caller and then later on on the September 29th call to

6  Senator Tillis the person that called in used their name Eric Welton.

7  Q.  Okay.  Were there any other threats related to your investigation

8  into this case made to any other agencies or consulates?

9  A.  Yeah.  During the course of this investigation threats were

10  compiled from the Iowa GOP, Senator Chuck Grassley in Iowa, the North

11  Carolina GOP, a private citizen named Ian Patrick Hines, and then the

12  U.S. Consulate General in Chiang Mai.

13  Q.  And were threats contained -- in addition to the threats to the

14  two senators' office, were there also threats made to the consulate

15  in Thailand?

16  A.  Yes, there was.

17  Q.  And was that -- were those recorded also?

18  A.  Yes, they were.

19  Q.  And were there also threats made to a Mr. Hines in Maryland?

20  A.  Yes.

21  Q.  And were those threats recorded or did they come in some other

22  form?

23  A.  Well, those threats came in via email and then there were several

24  messages left on Mr. Hines' wife's cellphone.

25  Q.  And what was Mr. Hines' job?

A. He ran a company called Nation Builder and I don't know exactly, but he compiled mailing lists and his clients were the Iowa GOP and the North Carolina GOP, among other people.

Q. And you said those threats were made to Mr. Hines' family. Who specifically was threatened?

A. His wife, her name was mentioned, and then his children's names were mentioned in the email that was sent.

Q. And the children were specifically threatened by name?

A. Yes.

Q. Was anything else attached to the email sent to Mr. Hines?

A. Yes. There was a photo of Mr. Hines' home in the email.

Q. And did it cause the Hines' family to act in any way?

A. Yeah. They were terrified. Mr. Hines called local law enforcement and they directed him to me, called me immediately, and then it's my understanding that they left their home for a period of -- some period of time, a couple weeks maybe, because they did not know who Mr. Welton was, where he was and what was going to happen and Mr. Hines was very concerned for the safety of his children.

Q. What email address did that threat to the Hines' family come from, the one that had the picture of the house and the threats to his family by name?

A. I don't recall off the top of my head, sir, I apologize.

            MR. RADICS: May I approach this witness, Your Honor?

            THE COURT: Yes, sir.

1   BY MR. RADICS:

2   Q. I'm showing you what's been marked as Government's Exhibit A.

3   Can you tell me if you recognize that document.

4   A. Yes, I do. This is the email that Mr. Hines received.

5   Q. And does it have an email string about where it came from?

6   A. At the top it says --

7   Q. Just read it to yourself. Did you read it to yourself?

8   A. Yes.

9   Q. Does that refresh your recollection as to who the email came from

10   to Mr. Hines?

11   A. Yes, it does.

12   Q. And what's that address?

13   A. It came from Eric Welton. There were two email addresses that he

14   was using.

15   Q. Okay. Was this one of the email addresses Mr. Welton was using?

16   A. Yes.

17          MR. RADICS: At this time the government would tender

18   into evidence Government's Exhibit A.

19          THE COURT: Have you shown counsel? Thank you. Yes,

20   sir, you may approach. All right. Thank you.

21   BY MR. RADICS:

22   Q. At any time based upon these threats was a criminal charging

23   document taken out such as a complaint against anyone?

24   A. Yes. There is a complaint and arrest warrant issued for

25   Mr. Welton.

Q. And was that for allegedly threatening senators in North Carolina

and the United States Marines in violation of Title 18, Code

Section 115(a)(1)(B) and (E)?

A. Yes.

Q. And since the time that complaint was taken out has anyone been

arrested?  Did Mr. Welton get arrested on those charges?

A. Yes.  Last Thursday Mr. Welton was arrested on those charges.

Q. All right.  Did you have the opportunity to interview Mr. Welton?

A. I did, yes.

Q. And he agreed to be interviewed by you?

A. Yes, he did.

Q. And did you play any of those alleged threats to Mr. Welton?

A. Yes.  I played several of them for him.

Q. And did you play the threats that were allegedly made to Senator

Tillis and to Senator Burr?

A. I did, yes.

Q. And did you play the alleged threats made to the U.S. Consulate

in Chiang Mai?

A. Yes, I did.

Q. And did you address the email sent to the Hines' family with

Mr. Welton or did you mention it to him?

A. I mentioned it to him and I discussed the emails to Mr. Hines, but

I did not show him specifically that email.

Q. Okay.  And what was his response, if any, after you played the

recordings to him in your interview?

A.  I asked him if he remembered sending those and he said, "It sounds

like me," and then after several of them he said, "Well, I guess I

won't be seeing my family again.  I really screwed up."  Things along

those lines.

Q.  Okay.  Regarding the defendant's living arrangements, where has

he been living for the last decade or so?  Are you aware?

A.  Yes.  In Thailand.

Q.  And what is the current status of his travel documents such as

his passport; do you know?

A.  His United States passport was revoked sometime ago.  He was still

able to travel on that to Africa.  I believe he was informed while he

was in Zambia that he was revoked and the U.S. State Department gave

him a temporary one to allow him to travel back to the United States.

Q.  Does he have family in Thailand?

A.  He does, yes.

Q.  And what family is that?

A.  His wife lives there.

Q.  Is she a Thai citizen?

A.  She is, yes.

Q.  Does she have the ability to come to the United States?

A.  No.  She does not currently.

Q.  Okay.  And is she able to get a visa or not?

A.  She hasn't been, no.  She hasn't been able to get one.

Q.  Has that had any effect on the defendant based on your

investigation?

1   A. Yes, it has.

2   Q. Did the defendant make any calls to any other agencies about

3   travel?

4   A. I'm sorry?

5   Q. Does the FBI have a National Threat Operations Center?

6   A. Yes, they do.

7   Q. And are you aware of the defendant calling that agency about

8   traveling to the United States?

9   A. Yes, I am.  This was sometime -- I don't remember the exact date,

10  but he called into our National Threat Operations Center and they

11  took the call and he was concerned about having a warrant for his

12  arrest at that time and wanted to know if he should just try to go to

13  Mexico and cross the border illegally into the country.

14  Q. He said he was thinking about crossing illegally into the United

15  States?

16  A. Yes.

17  Q. All right.  And on these - on these recordings to the two

18  senators and to the agency does he ever reference whether or not --

19  how people can get in contact with him?

20  A. No, he does not.  He specifically said on some of the recordings

21  that he does not have a cellphone and he usually calls in using like

22  a voice over IP so there's no cellphone number connected to the call.

23  Q. All right.  And when you interviewed him last week after his

24  arrest did he state whether or not he had any phones?

25  A. He said he did not have a cellphone.  I asked him for his

1 cellphone number and he said he did not use cellphones and he

2 provided me his wife's number and then his daughter's number.

3 Q. Okay. So he still said he didn't have a cellphone. Did you

4 search him incident to arrest last week when he was arrested?

5 A. Yes. His luggage was inventoried so that we would know what was

6 there and we found four cellphones and one laptop computer.

7 Q. And have you been able to gain access to those electronic devices

8 yet?

9 A. No.

10 Q. Are you planning to try to?

11 A. Yes, we are.

12 Q. All right. And what -- based on your investigation, what is the

13 alleged basis for these threats? What he was angry about?

14 A. Based on the investigation, he was angry with Republicans in

15 general for a number of reasons. One of which was the amount of mail

16 that he was receiving requesting contributions to different GOP

17 campaigns. The threats to the Marines and the consulate in Chiang

18 Mai, Thailand, he was angry about his wife being denied a visa to

19 come to the U.S.

20 Q. All right. So the threats made to the senators seemed to be

21 based upon him receiving email he didn't want to receive?

22 A. Correct.

23 Q. And you had the opportunity to listen to the recordings that were

24 sent by the prosecutor's office in North Carolina?

25 A. Yes, I have.

1  Q.  And are they a fair and accurate representation of the recordings

2  that you have with your file?  Are they the same thing?

3  A.  Yes, they are.

4  Q.  And after speaking with the defendant during your interview do

5  they appear to be the same person that you were speaking to last week

6  on the recordings?

7  A.  I believe so, yes.

8  Q.  And these recordings to Senator Burr's office and Senator Tillis'

9  office were obtained from their offices from their recording devices

10  which were recorded contemporaneously when the calls were made?

11  A.  That is correct.

12          MR. RADICS:  Your Honor, at this time I'd ask permission

13  to play the call to Senator Burr's office.

14          THE COURT:  Any objection?

15          MR. JOHNSON:  No objection, Your Honor.

16          THE COURT:  Yes, sir.  Go right ahead.

17                  (recording played)

18  BY MR. RADICS:

19  Q.  Is that the call to Senator Burr's office that was recorded?

20  A.  Yes, it was.

21  Q.  And that was based on your investigation because of some unwanted

22  emails received?

23  A.  Yes.

24          MR. RADICS:  All right.  Your Honor, I'd ask permission

25  to play portions of Senator -- the call to Senator Tillman's (sic)

```
 1   office.  We have the whole call if Mr. Johnson wants to hear it.  It's
 2   about 12 minutes long.  But I'm only going to play a couple minutes.
 3              THE COURT:  Is a couple minutes okay, Mr. Johnson?
 4              MR. JOHNSON:  That's fine with me.
 5              THE COURT:  May I ask the agent this was in 2021, sir?
 6              THE WITNESS:  September 2021, yes, ma'am.
 7              THE COURT:  Thank you.
 8          You may proceed, sir.
 9   BY MR. RADICS:
10   Q.  Going back to the call we just played to Senator Burr's office,
11   was that from September 7th, 2021?
12   A.  Yes, it was.
13   Q.  And this next call to Senator Tillis' office, is it from
14   September 29th, 2021?
15   A.  Yes.
16              MR. RADICS:  Your Honor, prior to playing the second
17   call we'd ask that the call to Senator Burr's office be admitted into
18   evidence for the purpose of this hearing.
19              THE COURT:  Any objection?
20              MR. JOHNSON:  No, Your Honor.
21              THE COURT:  It's admitted.
22              MR. RADICS:  May I sit down?
23              THE COURT:  Yes, sir.
24                         (recording played)
25              MR. RADICS:  That was the first portion.  3:35.
```

1                          (recording played)

2    BY MR. RADICS:

3    Q.  Special Agent, in those first two recordings on the call to

4    Senator Tillis specifically you hear him mention an address 310 New

5    Bern Avenue.  What is that building?

6    A.  That's a federal building in Raleigh, North Carolina.

7    Q.  And is that also where the federal courthouse is?

8    A.  I believe so, yes.

9    Q.  And was that mentioned twice in the call to Senator Tillis?

10   A.  The address was, yes.

11                   MR. RADICS:  Now going to --

12                          (recording played)

13   BY MR. RADICS:

14   Q.  The call we just listened to, Special Agent, that was a call made

15   to Senator Tillis' office on September 29th, 2021?

16   A.  That's correct.

17   Q.  The defendant talks about defending people.  Was he ever in the

18   military?

19   A.  Not to my knowledge, no.

20   Q.  All right.  Did he also mention a suicide vest?

21   A.  He did, yes.

22   Q.  What was that in reference to?

23   A.  It's hard to say in there.  But he had made several other calls

24   talking about setting C4 outside Senator Burr's office and then

25   blowing up 310 New Bern Avenue as well.

Q. And 310 New Bern Avenue is the senator's office, but also the federal courthouse mentioned two times; right?

A. Correct. And it's Senator Tillis' office so...

Q. At the very end he mentioned cutting off someone's hands and doing something with their hands?

A. He did, yes.

MR. RADICS: Your Honor, at this time I'll tender into evidence as Government's Exhibit 3 the call to Senator Tillis' office.

THE COURT: Any objection?

MR. JOHNSON: No, Your Honor.

THE COURT: It's admitted.

MR. RADICS: I'm going to play for you Government's Exhibit 4 at this time.

(recording played)

BY MR. RADICS:

Q. Was that call made to the U.S. Consulate in Chiang Mai on approximately November 2nd, 2022?

A. Yes, it was.

Q. And are there U.S. Marines stationed at that consulate?

A. Yes, there are.

Q. Did the defendant live over near that consulate?

A. Yes, he did.

MR. RADICS: Your Honor, at this time I'll tender as Government's Exhibit 4 the call made to the U.S. Consulate.

THE COURT: Any objection?

```
 1                MR. JOHNSON:  No, Your Honor.

 2                THE COURT:  It's admitted.

 3    BY MR. RADICS:

 4    Q.  When the defendant sent that threatening email to Mr. Hines and

 5    his family did he specifically mention Mr. Hines' wife and three

 6    children by name?

 7    A.  Yes, he did.

 8    Q.  And were those names accurate?

 9    A.  Yes.

10    Q.  And he sent them a picture of Mr. Hines' house and saying "I know

11    where you live"?

12    A.  Yes.

13    Q.  And was that, in fact, Mr. Hines' house where he lived in

14    Maryland?

15    A.  Yes, it was.

16    Q.  Government's Exhibit 3, which was the call to Senator Tillis, was

17    that also because he was angry about emails he received?

18    A.  As far as I know, yes.

19    Q.  Okay.  Are there other places that the defendant has lived that

20    you're aware of besides Thailand?

21    A.  I know he lived in Iowa for a time and I believe he lived in

22    Portland for a period of time.

23    Q.  All right.  During your interview did he mention about where he

24    could live or what he was -- where he was capable of living?

25    A.  He talked about his dad being in Iowa and said that the last time
```

he was here visiting his dad during covid, when he had to leave

Thailand, he had a really hard time staying there and staying around

people so he got a truck and he drove off and camped in different

national parks around the country because he couldn't be around

people.

Q.  Okay.  He did that -- did he say how long he did that for?

A.  No.  He did not.

Q.  But he was able to get a truck and live in national parks?

A.  That's what he claimed, yes.

Q.  Across the country?

A.  Yes.

          MR. RADICS:  Those are all my questions.

       Mr. Johnson may have some for you.

          THE COURT:  Thank you.

       Cross-examination.

          MR. JOHNSON:  Yes, Your Honor.

                      CROSS-EXAMINATION

BY MR. JOHNSON:

Q.  Good morning, Agent.

A.  Good morning.

Q.  So the first call that was made was on September 29th, 2021; is

that accurate?

A.  No.  That's not accurate.

Q.  When was the first call made?

A.  The first call that I'm aware of was made September 7th of 2021, I

1  believe.

2  Q.  September 7th.  But then when was the last phone call made?  I'm

3  asking because it was unclear from the criminal complaint.

4  A.  Sure.  So the calls in the criminal complaint, there's only two in

5  there.  There's a September 29th call and then -- that's 2021 and

6  then the November 2nd, 2022, call to the U.S. Consulate in Chiang

7  Mai.  So calls in the investigation, though, started in

8  September 2021 and continued on.

9  Q.  Continued on until when?  Regarding the North Carolina.

10  A.  Regarding North Carolina?  I think the last -- I'm sorry.  I

11  don't - I don't exactly know the last North Carolina call.  I

12  apologize.

13  Q.  I'll just take an approximation.

14  A.  I'd say fall of 2021.

15  Q.  Last call fall of 2021.  And then the second incident involving

16  the Thai embassy, that was in November 2nd, 2022?

17  A.  That's correct.

18  Q.  So about a 12-month span between the two incidents?

19  A.  Yes.

20  Q.  Was there any incidents between the fall 2021 and November 2nd,

21  2022 call?

22  A.  Yes.

23  Q.  What were those incidents?

24  A.  There were incidents of calls to Senator Chuck Grassley in Iowa.

25  There were calls to American Express headquarters in New York City.

```
 1   Q.  Why were those calls not included in the criminal complaint?
 2   A.  I think the U.S. Attorney's Office in the Eastern District of
 3   North Carolina picked the calls that was in their district.  So there
 4   was discussion with the AUSA's office -- or the U.S. Attorney's
 5   Office in Iowa and New York as well about whether they wanted to file
 6   charges in their states.
 7   Q.  And when you were beginning investigating Mr. Welton was there
 8   any evidence that he had purchased an airplane ticket to Raleigh,
 9   North Carolina?
10   A.  No.
11   Q.  Any evidence that you collected that Mr. Welton was planning to
12   drive to Raleigh, North Carolina?
13   A.  Not that I saw, no.
14   Q.  Was there any evidence that you recovered that Mr. Welton owned a
15   firearm?
16   A.  No.
17   Q.  Any photographs that he had sent posing with a gun?
18   A.  No.
19   Q.  And then following the calls to North Carolina you met with
20   Mr. Welton's father Richard Welton; is that correct?
21   A.  I did not.  But agents in Iowa did, yes.
22   Q.  And this interview was conducted in Charles City, Iowa?
23   A.  Yes.
24   Q.  And this was where Mr. Richard Welton lives; correct?
25   A.  I believe so.
```

1  Q. And during the interview were you aware that Mr. Richard Welton

2  says that his son gets, quote, "Lit up," end quote, before making

3  these calls?

4  A. Yes.

5  Q. And you understand being, quote-unquote, "lit up" means getting

6  drunk?

7  A. I didn't know what it meant, no.

8  Q. In your own -- I wouldn't even say your professional capacity.

9  But in your own personal capacity, have you ever heard someone

10  saying, "Hey, I'm going to get lit up," to refer to having a few

11  drinks?

12  A. I've heard it referred that way, yes.

13  Q. Okay. And during the interview and this portion (unintelligible)

14  into the criminal complaint -- excuse me. During your interview with

15  Mr. Welton did he -- clarify.

16        Did Mr. Eric Welton say that he was getting a car to drive

17  around Iowa when he was staying with his dad or was that his father

18  who mentioned that?

19  A. No. That was Mr. Eric Welton in his interview on Thursday said

20  that he got a truck not to drive around Iowa, but to drive around to

21  different national parks and stay.

22  Q. And this was -- when was he staying with his father?

23  A. He didn't know the exact dates. He just said it was during covid.

24  Q. So it was during the height of the covid pandemic?

25  A. That's correct.

1  Q.  As you stated earlier, the second incident involving the Thai

2  embassy occurred on November 2nd, 2022?

3  A.  That's when the recording was made, yes.

4  Q.  And this was the voicemail left at the Thai embassy?

5  A.  Correct.

6  Q.  After the November 2nd, 2022, voicemail, has there been any other

7  communications made to the Thai embassy that you're aware of of a

8  threatening nature?

9  A.  Yeah.  There were several messages sent over Skype and email.

10  They were around the same time so I don't know if they were after

11  November 2nd or right before, but around that time.

12  Q.  Around November 2nd?

13  A.  Yes.  Yes.

14  Q.  Earlier you said that Mr. Welton's U.S. passport has been

15  suspended?

16  A.  Revoked.

17  Q.  Revoked.  And were you aware that Mr. Welton was stopped in

18  Zambia due to his passport being revoked?

19  A.  Yes, I was.

20  Q.  Were you aware that Mr. Welton spent five days in a Zambian jail

21  awaiting his travel documents to the United States?

22  A.  I don't think that's accurate.

23  Q.  How do you understand it?

24  A.  Because I was notified by the Regional Security Officer from the

25  State Department in Zambia when Mr. Welton was detained up north of

1  Zambia and then the FBI worked with State Department and Zambian law

2  enforcement to have him transferred to Lusaka the next day and then

3  we purchased his ticket to fly him home from Lusaka, Zambia to the

4  U.S. and that was maybe four days, but most likely three.

5  Q.  During that time where was Mr. Welton being held?

6  A.  Where was he being held?

7  Q.  Uh-huh.

8  A.  Wherever the Zambian law enforcement held him.

9  Q.  In jail?

10  A.  Probably.  But it wasn't five days is what I'm clarifying, sir.

11  Q.  But he was in a Zambian jail?

12  A.  If that's what he says, yes.

13  Q.  When the call was made to North Carolina was there any moment

14  where -- let me rephrase.

15       The call was made to the office of a Republican senator;

16  correct?

17  A.  Which call?

18  Q.  The call to North Carolina in September of 2021.

19  A.  There were several.

20  Q.  There were several calls.  But my point being is when you're

21  calling the senator the caller may not know that they're calling a

22  federal building; correct?

23  A.  I guess a caller may not know that.

24  Q.  Going back -- I'm sorry for skipping back.  But going back to the

25  call to the Thai embassy, was there ever any evidence collected that

1   Mr. Welton possessed a gun while making that threat?

2   A.  Not that I'm aware of.

3   Q.  Any evidence that he was going to go down to the Thai embassy and

4   act upon that threat?

5   A.  Not that I'm aware of.

6           MR. JOHNSON:  Briefly, Your Honor.

7           THE COURT:  Yes, sir.

8   BY MR. JOHNSON:

9   Q.  Who has Mr. Welton's passport now?

10  A.  That I don't know.

11  Q.  The physical.  Was it seized in Zambia?

12  A.  No.  It was -- the one that he had to travel back here --

13  Q.  Uh-huh.

14  A.  -- we have in FBI custody.

15          MR. JOHNSON:  Briefly, Your Honor.

16          THE COURT:  Yes, sir.

17          MR. JOHNSON:  No further questions, Your Honor.

18          THE COURT:  Thank you.

19      Any redirect?

20          MR. RADICS:  Briefly, Your Honor.

21          THE COURT:  Yes, sir.

22                  REDIRECT EXAMINATION

23  BY MR. RADICS:

24  Q.  Special Agent, Mr. Johnson asked you if there were any other

25  incidents -- instances of threats involving what you've already

1   testified to.  Were there any other instances of threats relating to

2   the Hines' family other than the email and the picture sent?

3   A.  There was at least one additional email that was sent and then, as

4   I've stated before, Mr. Hines' wife received at least three calls and

5   three messages were left on her cellphone from Mr. Welton.

6   Q.  What was the nature of those messages on her cellphone?

7   A.  I know one of them talked about the kids again in a way that

8   Mr. Hines took as a threat and was very disturbing to him and his

9   wife.

10  Q.  And you were also asked on cross whether the caller might have

11  known it was a federal building.  Isn't it true that on the two

12  calls, Government's 2 and 3, which were calls to Senator Burr and

13  Senator Tillis at least on one of those calls the caller specifically

14  mentioned that he knew the address of 310 New Bern Avenue where he

15  was going to come down and shoot people?

16  A.  That's correct.

17  Q.  And that is a federal building and where the senators' offices

18  are; correct?

19  A.  Yes.

20           MR. RADICS:  Okay.  Thank you.

21           THE COURT:  Thank you.  Any other evidence the

22  government wants to present at this time?

23           MR. RADICS:  No other evidence at this time, Your Honor.

24  We have argument.

25           THE COURT:  Thank you.

1          You can step down, sir.  Thank you.

2               THE WITNESS:  Thank you, Your Honor.

3               THE COURT:  Uh-huh.  You're welcome.

4          Mr. Johnson, I'll hear from you, sir.

5               MR. JOHNSON:  Yes, Your Honor.  Your Honor, may I

6    approach?

7               THE COURT:  Yes, sir.

8               MR. JOHNSON:  I'm handing you what has been marked as

9    Defendant's Exhibit 1.

10              THE COURT:  Okay.

11              MR. JOHNSON:  I'll review those items with you.

12              THE COURT:  Okay.

13              MR. JOHNSON:  The first two pages are character letters

14   that were received by -- that I received from Mr. Welton's daughter

15   Eve Welton, an email on Sunday, May 28th, these were character letters

16   written on Mr. Welton's behalf.  And I provided a copy to the

17   government, Your Honor.

18              THE COURT:  Okay.  Thank you.

19              MR. JOHNSON:  And then of these character letters is an

20   email I received from Mr. Welton's father Richard Welton regarding his

21   health, Mr. Richard Welton's health, and residency where Mr. Welton

22   could possibly live and then a -- I believe, a fax or an email from

23   Floyd County Medical Center regarding Richard Welton's health and the

24   final page is a photo of Mr. Welton providing donations, to my

25   understanding, to the hill people of Thailand where he lives.  I'll go

1   over that in detail, but I wanted the Court to have a copy.

2           THE COURT:  Okay.

3           MR. JOHNSON:  So I support pretrial's recommendation

4   that Mr. Welton be released on a $10,000 unsecured bond.  I would ask

5   that the Court impose alcohol counseling upon Mr. Welton, anger

6   management, any type of counseling services.  There's repeated

7   references to posttraumatic stress disorder.

8           Mr. Welton has no ties to the metro Atlanta area.  He was

9   apprehended while going through customs in Atlanta Hartsfield.  If he

10   was allowed to continue to Iowa then he -- we would have been making

11   the argument in Iowa that Mr. Welton's ties to the community are very

12   strong.  Mr. Welton, if granted bond, can travel to Iowa - he has the

13   resources to do so - where he would be living with his father.

14           As I provided to the Court from the email I received from

15   his father, Mr. Richard Welton is ill with terminal cancer.

16           THE COURT:  Uh-huh.

17           MR. JOHNSON:  Mr. Richard Welton writes, quote, "It is

18   correct that Eric will be caring for me in Iowa.  My prostate cancer

19   has spread to the bones and liver.  In February of 2022 the doctor

20   said I was 50/50 for two years but seem to be getting along but the

21   cancer is growing.  So this could be my last opportunity to spend time

22   with my son," end quote.  So that is what Mr. Welton would be doing if

23   granted bond.  He would be residing with his father and taking him to

24   medical appointments and caring for his father during these last

25   months that he is alive.

1       Along with Mr. Welton, Richard Welton, it's my
2  understanding that Mr. Welton's daughter Eve Welton, who currently
3  lives in Austin, Texas, will be relocating to Iowa to be with her
4  father and grandfather.  Ms. Eve Welton, who is attempting to get to
5  court today from Austin, but tickets were a little expensive at this
6  last moment over Memorial Day.
7       THE COURT:  I'm sure.
8       MR. JOHNSON:  -- (unintelligible) I was in
9  correspondence with her last night.  But she has represented to me
10  that she is in the process of moving to Iowa next week which she would
11  stay with her grandfather, Richard Welton, and her father.  So there
12  is community ties to Iowa.
13       I know the government said that Mr. Eric Welton had
14  purchased a vehicle and traveled to national parks.  I think that was
15  just a consequence of being under covid lockdown, the onerous
16  conditions of the pandemic.  Given these charges, the very real
17  serious consequence of jail time, he's not going to be violating the
18  conditions of his bond by leaving the Northern District of Iowa to
19  spend the night at a national park.  I think that was just more him
20  getting a little stir crazy under what was a very stressful time for
21  the country and the globe.
22       I'm not trying to discount what we heard in court today,
23  Your Honor, that never has been my style.  But I would be remiss if I
24  did not say that the genesis, the impetus, for many of these calls was
25  Mr. Welton's alcohol abuse.  His own father said that these calls were

made when Mr. Welton was "lit up." So he's stuck in Iowa, he was receiving these emails, he felt like he was under attack. Not excusing. Just explaining. He got, unfortunately, drunk and in that deep state he made these calls and threats. That's the allegation.

The evidence is strong against Mr. Welton, I'm not going to discount that, but that also repeated itself a year later. Again, a year later is what we're talking about between these two threats. If this was ongoing, continuous communications, I think we would be in a different posture.

When Mr. Welton returned to Thailand, he was attempting to get his wife a visa, it was a very trying, difficult experience, he got intoxicated, went on this bender and made these lamentable communications. But from the agent's own testimony, this was in November -- early November 2022. There has not been an incident since. Now we are approaching early June, late May. So I believe once you remove the alcohol, remove that impetus, you remove those conditions that lead to these calls.

Also, Mr. Welton, as you heard from the agent, never took any steps to actualize these threats. Didn't own any firearms. Didn't attempt to go to North Carolina. Didn't attempt to go down to the embassy. He made a series of unfortunate calls and emails. But he never possessed the means or the intent to realize these threats. And that makes sense because if you look at Mr. Welton's history there's no arrests for crimes of violence, no instances of domestic abuse, no aggravated assaults. He has a DUI from, I believe, the

1  early aughts that I don't think would receive criminal history points.

2  So that is an important distinction to make.

3           Now, the character letters I have submitted to the Court,

4  I'm going to quote from a few.

5           The first was from a nice woman by the name of Autumn

6  Landry who's a Citizen Liaison from Pai, Thailand.  She writes, I

7  quote, "I personally know this man and have known him for many years

8  that I have also lived in Pai.  I know without a doubt that his

9  deportation would have a devastating impact on both the local Thai

10 community in northern Thailand and of course his family.  He has

11 always been a pillar of the Pai community supporting local Thai

12 citizens, charities and also the Thai government.  He has worked on

13 projects for Prayuth, the Navy, and the Marine Department helping

14 Thailand's seafood industry avoid EU sanctions related to human

15 trafficking and slavery.  He has made generous donations to the Lanna

16 Hospital in Chiang Mai and Pai local veterinary services helping build

17 a sanctuary."  That sanctuary was actually a cat sanctuary to stop the

18 spread of feral cats.

19           THE COURT:  Okay.

20           MR. JOHNSON:  "He actively participates in supporting

21 projects delivering supplies such as medicine, healthcare, food and

22 clothing to remote villages.  He currently financially supports 18

23 local Thai families, pays for schooling for several young children and

24 has heavily supported local businesses in getting back on their feet

25 after the pandemic.  Not only that but he has worked in conjunction

with the CMU and Mae-Jo University to develop organic pesticides and
soil additives to further innovate Thai agriculture.  He's also aided
the Thai government working on SCB's Digital Venture's startup
incubator and has advised and consulted several Thai software
startups.  He has advised CMU's CAMT and currently supports Bangkok
startups developing trust and certification technologies.  It is clear
he plays an important role in Thailand and must continue to be able to
reside here to do so."

        Of course he's not going back to Thailand (unintelligible)
very shortly, but this is the impact he has made to this underserved
developing state helping local families, providing for their
well-being, being a great resource of charity and philanthropy.

        The second letter I'm going to quote is from Hunter Main
(sic) who is an American combat vet.  In the second paragraph - "Aoy,"
which is the nickname for Mr. Welton's wife, "Aoy and Eric are pillars
of this community and have a far-reaching positive influence here in
Pai.  I know other letters have been sent on his behalf in regards to
this.  I will give you my personal experiences with him.  For me
personally, they provided us with the necessary resources to get
through covid when oil bottomed out and I lost my income.  I owe them
my entire current existence in Pai, from the businesses to our future
home.  It has now put my wife and I in a position to give back to this
amazing community as we try to follow Aoy and Eric's example.  Another
way they helped us was early in our relationship my wife and I had
separated because of misunderstanding of cultures.  It was Aoy and

Eric that sat us down and helped us overcome those obstacles and understand our differences. We have now been together over four years and are proud to have our first child on the way. Just for that I will always be eternally grateful. There are a million reasons I'm happy to have them as my adopted parents. They are the kind of people who would give you the shirts off their backs even when they did not have the shirts to give." I think that speaks accurately of who Mr. Welton is.

So much of the time you hear these accusations, they're trapped in a vacuum, these accusations. But Mr. Welton has done some incredible good, both at the micro/macro level, for his adopted community in Thailand, and I think that speaks to his true character removed from the deleterious effects of alcohol. The government also made -- so I think I have addressed threats to a community. You remove the alcohol, you remove the threat. Stable residence. That's who Mr. Welton is from those he has helped and provided charity.

Now regarding the flight risk, it's easy to mitigate the flight risk. The State Department has his passport. The fact that he was caught shows that he can't get on a plane and flee.

He traveled to Africa for business. Mr. Welton was involved in the Digital Border community so he was traveling to Zambia to consult and learn about their border crisis. He was actually on his way to Helsinki for a different conference. He was detained in Zambia because his passport was flagged. He was held in a Zambian jail and then put on a plane with a one-way ticket here to the United

1    States.

2            If granted bond, Mr. Welton will reside in the Northern

3    District of Iowa and travel only to North Carolina.  There is no

4    possible way or means he can get back to Thailand.  The accusation

5    that he would flee to Mexico I think is unfounded.  I don't think he

6    has the means or the desire to do that, to travel to a country he has

7    no relationship with and no family with so he's going to remain in

8    Iowa.

9            The criminal exposure that he's facing for this is not so

10   severe as to induce flight.  Many times the government will say "But

11   look at the 20, 30 years, probably should not grant bond because he's

12   getting on a plane to a non-extradictable country."

13           I ran Mr. Welton's guidelines.  Again, he has a Criminal

14   History Category of I, I assume 0 criminal history points.  So under

15   2A6.1, which is the threatening communications guideline, we'll start

16   with a Base Offense Level of 12.

17           Under 2A6 - 2A6.1(a) he's going to get a two-level

18   enhancement because there were two or more threats.  So now we're at a

19   14.

20           Earlier I aired on the side of caution and I will assess

21   him a four-level interruption-of-government services because the agent

22   said they had to evacuate the federal building, which I don't believe

23   Mr. Welton knew was a federal building when he made this call.  He

24   just thought he was calling Republican offices.

25                   THE COURT:  Okay.

MR. JOHNSON:  So 12 plus 2.  14 plus 4.  That's 18.  If he pleads guilty, he'll have a total Offense Level of 15.  15 under Criminal History Category I is 18 to 24 months in custody.

There is a three-level official victim enhancement that could apply.  But the application note, the way I read it, makes me think there's a good argument against it.

So Mr. Welton will not be attempting to flee to Mexico or Thailand, which is logistically impossible, to avoid an 18- to 24-month sentence where, you know, given the mitigation, the 3553(a) factors, he very well can try to drive down to a Zone B for home confinement.

You know, we've heard the agent talk.  Mr. Welton didn't come in and say "What are you talking about?"  I think he's expressed sincere contrition for this very terrible time in his life and these very unfortunate things that he has done.  He's committed to doing better.  He's committed to remaining sober.  He's committed to going to the therapy that the Court imposes.  So I ask the Court to grant him a signature bond.  If the Court says "I don't really like the signature bond idea," Mr. Welton is of the means to afford a surety bond if need be.  I've also spoken with his father, they have money, too, which is atypical, in my experience.

But, you know, Mr. Welton, no criminal history, has a residency he can stay at, the criminal exposure here.  I'm asking the Court to grant him bond.  I think this is a very, very unfortunate, aberrant act that the character letters, I hope, that I submitted to

1   the Court did speak to Mr. Welton's true character and his true

2   capacity for good and decent actions.  Thank you.

3               THE COURT:  You're welcome.  Thank you, sir.

4               I'll hear from the government in rebuttal.

5               MR. RADICS:  Your Honor, the government's asking the

6   Court to deny bond based upon the two arguments we mentioned earlier.

7               Number one, the defendant is a serious risk of flight and

8   the reason he's a risk of flight is because he's facing very serious

9   charges.  He's facing potentially 10 years in prison.  Most likely he

10  won't get 10 years in prison.

11              But he's facing charges in a country that he doesn't even

12  want to be in.  He doesn't want to be in the United States.  He

13  doesn't like it here.  He's spent the last, he says, 20 years of his

14  life in Thailand building a life over there.  We have information that

15  he's been over there for 12 years.  His wife is over there.  Our

16  country, the United States, won't allow her to visit for whatever

17  reason.  So she's over there.  He has every reason to flee.  I believe

18  if you gave him any sort of bond he's going to be gone.  Maybe he

19  can't travel on a plane out of our airports, maybe he can.  We don't

20  know how he was traveling from country to country in Africa with a

21  revoked U.S. passport but he was able to do that.

22              He was - he mentioned on a call that if he was unable to

23  come here legally he would come illegally through Mexico.  The fact

24  that he's contemplating coming to the United States illegally through

25  Mexico can be reversed.  He can contemplate leaving.  We're not saying

he's going to flee to Mexico, but we're saying that he's a risk of
flight to flee from this country to flee from court to flee from
potential ramifications of what he's charged with.

He has a very strong reason to flee because he's facing
charges. He doesn't have a criminal history other than a DUI. So
he's facing potentially jail time and he has a place to go. He has a
place that he wants to be and a place that he has lived for many years
and he has people there who care about him. He's established a life
over there so he is a risk of flight. The evidence against him is
very strong.

The evidence also shows -- and this ties in our argument
that he's a risk to threaten or intimidate prospective witnesses. The
evidence shows that based on slight provocation so much as he was
receiving emails that he didn't want that that caused him to act in a
way that you heard on those recordings - on those recordings. At
least for the two recordings to the senators, that was simply because
he got some emails he didn't want. He didn't want to put them in his
junk folder. He didn't want to ignore them. That set him off. We
can only imagine how triggered he is at this time since he's been
arrested for this, it's going to be even more increased, and it's very
frightening that that can happen.

We're not -- the government's not arguing that he's
necessarily going to harm people because that's not the standard.
He's charged with an offense of threatening people, threatening and
intimidating people. In fact, that's exactly what he did on those

calls. He's talking about raping peoples' children. He's talking about cutting off their hands, shooting them in the face, and intimidating and threatening one victim to the point where he finds out where this victim lives in Maryland, sends that victim an email with a picture of that victim's house, names that person's children by name and says what he's going to do to them. That is threatening and intimidating witnesses and the government's burden is that we need to show he's a serious risk that he will threaten or intimidate witnesses. Not that he's going to harm them, not that he's going to blow up any courthouses. But he is definitely easily a risk to threaten or intimidate witnesses because that's what he's charged with, that's what he's basically admitted to doing. And not just standard threats "I'm going to get you," but specific terrifying personal threats to people. How he's going to do it. Where he's going to do it. He knows where they live.

The defendant, I think, would have the Court believe that, well, he was doing this because he was drinking too much and that's the only reason. The defendant, per the Pretrial Services' report, was drinking until blackout, by his own admission, until January of 2023. He hasn't gone to any alcohol treatment or anything since then. In fact, since January 2023 he says that he's lessened his alcohol to drinking hard alcohol only every other day. So regardless of whether or not it's true that it's only alcohol that's causing him to act in this way, that problem hasn't been taken care of so he's still a very serious risk to threaten or intimidate witnesses in this case.

1    The defendant has the means to flee. In the Pretrial
2  Services' report he indicates that whenever he needs money he asks his
3  father and his father gives him a stipend and his father has $5
4  million. So it sounds like he could ask his father for money if he
5  needed it to assist in getting back to Thailand or whatever other
6  country he would want -- he wants to try to get to.

7    He mentioned that -- he claims that he wants to live with
8  his father, but this is the same father that -- the fact is he said
9  this. This is not speculation that maybe it was covid that made him
10 want to go someplace. The fact that we know is that he tried to live
11 with his father, he couldn't do it, so he got in a van and, instead,
12 went to live in national parks off the grid so he has the ability to
13 do that also even if he doesn't flee this country. He has other
14 locations basically anywhere in our national parks, which are many and
15 numerous, where if someone wants to not be found they can do that and
16 in this case it seems like he has the ability or at least claims to
17 have the ability to do so until maybe he can get back to Thailand.

18   So, again, the government's burden is not necessarily what
19 I think the defense wants the Court to think is the burden that he has
20 the means or has weapons or firearms that he's going to necessarily
21 act on. We don't know if he is. It doesn't seem like he has. But
22 that's not the question. The question is is he a serious risk of
23 flight? And I think the answer is yes.

24   Secondly, is there a serious risk that he's going to
25 threaten or intimidate witnesses? There is. Because whether it's

because he's drinking or not, because nothing's been done about that drinking, there's a serious risk if he gets out he's going to get hold of a phone and he's going to call someone. Who knows if it's the same people or some one else, but he's going to call them.

And that's also interesting that he made no -- on one of the recordings, which was played to the Court, he said three times in a row I don't have a phone, I don't have a phone, I don't have a phone. When he was arrested here at the airport, he told the agents I don't have any phones. I don't use a phone. But he has four phones and a computer or two computers, I can't recall exactly, but he has at least one computer and four phones. So unfortunately we couldn't get the information from the phones in time for this hearing. But based on the evidence that we've presented so far the government believes that he is a serious risk to flee and that there's a serious risk that he will intimidate or threaten prospective witnesses in this case. We'd ask you to deny bond.

THE COURT: Thank you.

Mr. Johnson, yes, I'll let you have the final word.

MR. JOHNSON: Thank you. I will be brief.

THE COURT: Yes, sir.

MR. JOHNSON: Your Honor, regarding those phones, my understanding is that Mr. Welton purchased those phones in Africa where they were cheap and he was gifting them to members of his community in Thailand.

THE COURT: Okay.

1          MR. JOHNSON:  They were not his personal phones.

2          I did not mention this earlier and I do apologize.

3   Mr. Welton is on a series of medications.  I believe he takes four

4   medications for his heart.  He also acquired a nasty foot infection in

5   Africa where he's under medication.  Currently at Robert A. Deyton

6   he's not receiving these meds so that's another consideration for the

7   Court that he continue with his medical regime if released.  In

8   speaking with Mr. Welton, he is at a risk for stroke if he's not

9   receiving these medications and there's also concerns about PTSD as

10  well and receiving the necessary medications for that condition as

11  well.

12          THE COURT:  Thank you.

13          Thank you, counsel.  I appreciate your argument and the

14  evidence that has been presented.

15          Mr. Welton, I do not disagree with your lawyer.  I believe

16  that the work you've done for your community in Thailand is certainly

17  to be commended.  It's clear that you care about the Thai people and

18  your wife's community, your community, because you've been there for

19  decades.  And I believe that the letters submitted on your behalf are

20  sincere and that you do good things when you are at home with your

21  family and in the community that you love.  So I certainly don't want

22  to negate the relevance of that.  It certainly is clear that you've

23  done very good things in your adopted homeland.

24          You have no history of violence.  I agree with your lawyer

25  this is relatively old conduct in the sense that some were dating

1   back a couple of years, these calls and emails that were made, and I

2   agree there's no evidence that you had a weapon, that you traveled at

3   all near where the senators are residing or the gentleman who was

4   responsible for sending the emails or at least owns the company that

5   does so or that you're going to do that.

6         My concern is one that's been raised by Mr. Radics and that

7   is not physical harm, but psychological harm and what that does to

8   people, especially people -- private citizens who have young children

9   and the nature and the tenor of the emails, of the phone calls, were

10   really disturbing and whether you have children or not that is very

11   disturbing.

12         The fact that you claim that this is based on your

13   alcoholism, that certainly is a disease that is one that's affecting

14   you, but it continues to affect you.  As you readily admit, you've

15   been drinking every other day the amount you are is very problematic.

16   So my concerns are, one, that the danger continues and that it's not

17   one that's a physical one, but one that is psychological in terms of

18   calls or emails.

19         Two, that you were not honest with the agent when asked

20   about the cellphones.  He asked you specifically if you had any and

21   you said no and whether they were for you or for someone else, you

22   did have phones, you had laptops, and you also have what appears to

23   be pretty sophisticated computer skills which is your expertise and

24   you've done that with other startups.  So there are ways you're

25   communicating maybe not in the way I do just on a regular phone, but

1   there are ways for you to communicate and the government's still

2   trying to figure that out.

3           But I'm concerned about the safety of the community.  I'm

4   concerned certainly about risk of flight.  You are a sophisticated

5   international traveller and the fact that you have traveled the

6   world, lived over the world, and whether or not you can do that

7   lawfully, the evidence is that you are able to move at least through

8   the African continent on what was an expired visa or passport at that

9   time.  So those are my concerns.

10          Based on that, sir, I do believe the government has

11  established that you are a risk of flight and a danger to the

12  community.  I will grant the government's motion for detention.

13  However, once you're returned to North Carolina you can then ask the

14  district court there to reconsider my ruling and if she disagrees

15  with my findings, you can appeal this and she may have a different

16  result.  But my finding is the government has met its burden, has

17  shown that you are a risk of flight and a danger to the community and

18  I'm remanding you to the custody of the U.S. Marshal.

19          All the exhibits have been entered.  If there's nothing

20  else, we're adjourned.  Good luck to you, sir.  Thank you.

21                      (proceedings concluded)

22

23

24

25

1   UNITED STATES DISTRICT COURT

2   NORTHERN DISTRICT OF GEORGIA

3   CERTIFICATE OF REPORTER

4

5          I do hereby certify that the foregoing pages are a true and

6   correct transcript of the proceedings, to the best of my ability,

7   taken down by me in the case aforesaid.

8

9

10                     This the 26th day of March, 2024.

11

12

13                                    /S/ Alicia B. Bagley
                                      ALICIA B. BAGLEY, RMR, CRR
14                                    OFFICIAL COURT REPORTER
                                      (706) 378-4017
15

16

17

18

19

20

21

22

23

24

25