CHARACTER REFERENCE DOCUMENTS

Please find attached character reference documents

- Two letters originally sent to the Consulate during efforts to diffuse the situation with the consulate, prior to the defendant's offer of surrender, and prior to the consulate's escalation
  - Letter from Autumn Landry
  - Letter from Hunter Cain
- Transcript of video documentation of support

Photo of the defendant passing out material. The defendant and several families participate in yearly charity drives where they and other families drive out into the surrounding countryside, on the edge of the Myanmar conflict zone, and distribute supplies to the villages. The supplies are provided by the participants and not from some NGO or other source. This is included here as it was provided at the detention hearing as well, as were the letters from Autumn and Hunter.



OCCUPATION OF THE DEFENDANT

At this point it is time to clear the air about what, in fact, the defendant does. Probation lists him as a farmer, which is true. O'Connor reports the farming operations as well and lists the feline sanctuary. There is reference to an education in software, and the pursuit of a PhD in cognitive science which was aborted ABD, picking up a Master's on the way out the door, before dashing off to chase some dot-com dreams. Then there was more academic work, work in the finance industry, some startups in global internet traffic management, and during the competency hearing the defendant described his last easily quantified job as one involving border control and biometrics working for a contractor employed by the government of Saudi Arabia. However, as recorded earlier, in the early 2000's the defendant radically restructured his life in keeping with a Buddhist minimalist tradition, divested himself of possessions, peacefully exited a marriage, wound up relocating to rural northern Thailand, and, with the exception of some occasional formal work such as the job in Saudi Arabia, has generally worked as an independent consultant in social justice technology projects all while operating the farms and restaurant.

Over the last decade (including the time of incarceration[16]), the defendant has focused on digital rights in the global south, specifically in areas of national identity systems and digital issues related to human migration and global trade. He has worked on a wide range of projects,

---

[16] Record analysis during incarceration will demonstrate that the defendant continued research in the erosion of cognitive agency in the context of Artificial Intelligence, ordering and reading a substantive body of works by Robert Thaler (the founder of Behavioural Economics), who along with Cass Sunstein, developed and popularized the Nudge movement, along with essential books on the Ethics and Morality of markets, the ethics of information disclosure, and a substantive body of material send in as PDFs specifically around the tension between Nudges and cognitive boosting, because he came across the paper "Beyond the Brave New Nudge: Activating Ethical Reflection over Behavioral Reaction" (https://journals.aom.org/doi/abs/10.5465/amp.2022.0162), which paralleled work the defendant began in a limited distribution mailing list with a bunch of ivy-league faculty on the topic of agency-erosion in the age of ai-mediate hyper-personalization without appropriate data-privacy controls in the United States.

including projects with the Thai government combating human trafficking in the regional fishing industry using biometrics and labor registration, to supporting the technical foundations of covid and pandemic credentials in southeast asia, he has drafted versions of tenders for national id projects and related projects in Myanmar with an aim at countering the worst impulses of the Junta. He has done silly flings with NFTs and ICOs on larks, he has established and led regional technology working groups and forums that continue their work to this day, has served on the advisory boards of startups and incubators and, at the time of arrest, was in the process of launching a round of companies which captured the major output of half a decade's effort. In these companies he had developed a solution to a problem of complex border communities where urban areas are bisected by borders - the developing world's equivalent to El Paso/Juarez.

In fact, this is what took him to the Kasumbalesa border crossing between Zambia and the DRC, with the blessing of the Zambian government. Here is a useful video about the issue of interest to the defendant at the Kasumbalesa border (https://www.youtube.com/watch?v=Xgt9HPdXP0I). In consultation with the immigration ministry, the defendant was focused on the substantive human migration issue involving individuals such as the border trader in this picture



for whom a passport costs one month's worth of wages and who might cross the border several times per day. That entire bicycle is loaded with tomatoes, purchased in the relatively affluent

nation of Zambia (which is currently on the Trump-2 travel ban list), and then brought into the Democratic Republic of Congo. Using a standard passport process would consume approximately 3 passports a year, meaning that a substantive portion of the wage is devoted only to passport production. As a result, passport-driven border control is not used, leaving a gap for roughly 15,000 border crossings for this class of individual. The defendant encountered this problem while attending the BMIC6 conference in Bangkok. The defendant attended that conference while the consulate was pursuing extradition[17].

BMIC was founded by the International Organization for Migration (IOM) and the Asia Pacific Smart Card Association (APSCA) as an initiative to support improvements in border and identity management, with a focus on the Asia Pacific region. The biennial meeting has a specific focus on fostering border and identity governance through closer consultation and cooperation between the key stakeholders in the sphere of identity management, including:

- Government authorities responsible for border and identity management
- International partner organizations and development agencies
- Leading providers of identity solutions
- Subject matter experts

The conference includes an exhibition of the latest solutions and technologies designed to improve facilitation of cross-border movements while strengthening national security, to enable government authorities and international partner organizations to advance border and identity management processes.

---

[17] To be very clear - this was after the defendant had presented himself to the consulate for arrest, at the behest and under observation by the Thai officials. The Thai officials had already investigated the defendant and the defendant had cooperated, fully, transparently, and openly. The consulate had refused his arrest and then, several weeks later, the consulate asked the Thai officials to arrest the defendant, threatening Thai officials with punitive actions should the Thai officials fail to find or fabricate justification for the arrest. The reason for the failed extradition was that the Thai officials, watching all this, concluded that the problem was an internal domestic cat-fight and that the defendant was acting honorably and responsibly. For this reason there was no problem with the defendant attending an international conference of immigration officials, including senior officials of the Thai immigration authority.

Of particular relevance to the defendant were workshops on "*Integrating climatic risks into analysis of and preparation for cross-border population displacement*" and "*Credentials for pandemics: Innovative solutions to issues and processes involving 'immunity documents'*". Here is a picture of the defendant meeting with biometric collection device and document scanner vendors. The defendant is holding the portfolio that accompanied him from Ouagadougou to Tombouctou, and wearing the suit and shoes currently being withheld by AUSA Lori Warlick.



In the seated photo the defendant is meeting with people with whom he is collaborating in responding to a tender for the National ID Project in Myanmar. These are exceptionally challenging projects, not so much because of the technology, but because of the social and geopolitical contexts. The evidence available to Agent Corey Zachman contained several communications with political figures associated with foreign governmental missions in Myanmar (non-American, the defendant does not work with Americans, because in the defendant's experience Americans, by and large, are evil - they are transactional, greedy, and lack honor).

Here is the defendant meeting with a delegation from Papua New Guinea, which is facing specific challenges related to migration and climate change.



And here he is discussing the needs and challenges faced by the Kingdom of Eswatini.



The business cards of all of these people, as well as the Zambian government officials,
Seychelles, Saudi Arabia, and others are in the property currently being held by AUSA Warlick.

The defendant regularly gave talks at conferences such as Identity Week Asia, a standard
industry trade show, and here are some slides from one of his talks. They are included here
because they are relevant to establishing the nature and character of the defendant above and
beyond the level of "passionate about data security". The defendant worked in digital
transformation at the nation-state level, far above and beyond the political consultancy level of
campaign email outreach. This series of talks was aimed at decision and policy makers

operating at a governmental level concerned about issues such as how their national

sovereignty was endangered due to reliance upon hyperscalars such as Amazon or Microsoft.







The defendant is talking about how a country can benefit and learn from example states like India (Aadhaar), Singapore, and Estonia. And the defendant concluded that talk with the following set of discussion points:

- Digital transformation is the obligation of a society. This obligation is driven by the global economy and our shared needs, including:
  - surviving climate change
  - responding to increasingly common pandemics
  - promotion of dignified societies with a high quality of life
- Should and how can Public/Private Partnerships drive digital transformation in a locally appropriate and integrated manner, adapting as is appropriate to local social and legal considerations (which costs money)
- How can we, as the vendors and technologists implementing this social digital transformation
  - … require or guarantee the appropriate policy and social conditions exist for the ethical deployment of our solution stacks
  - … balance the greenfield leapfrog opportunity of SIDS and EDS's with sensitivity to colonial and indigenous social tensions and the ever changing local landscape digital literacy and access.
- What are the causal relationships between Business, Legal, Technical, Social - who drives the bus?

This gives you substantive clues as to the character of the defendant. This defendant is not particularly interested in 'making a buck' or in trying to maximize your ROI and really does not talk about money at all. The defendant is not selling anything. This defendant is always talking about politics and social change. This shows up again in the participation in conferences like Thoughtful Biometrics or the APAC Digital Identity unConference. Thoughtful Biometrics was an online venue of biometrics vendors and practitioners and the defendant led two sessions. Below is the table of contents from the proceedings, with the defendant's two sessions highlighted. The second is specifically relevant to the technology he intended to deploy in Kasumbalesa.

Session 1 / Room A: Biometric Privacy Considerations in an SSI Project

Session 1 / Room B: Title: When is biometrics useful and when is it not?

Session 1 / Room C: What are the biggest blockers in the mass roll-out of biometric technology? How we combat these as a community?

**Session 1 / Breakout D: How to cope with Vendor-driven messaging to governments.**

Session 2 / Room A: Securing DNA in Biometric Authentication

Session 2 / Room C: Resurgence of the Identity Ecosystem: What does it mean, who should be engaged, and what aspects should be considered in a framework for development of a policy.

Session 2 / Room E: Stimulating a more nuanced discussion with policymakers and implementers

Session 3 / Room A: Operating models - How can different operating models enable interoperability while diminishing risks

Session 3 / Room B: A Thoughtful Process for Regulating Digital Identity

**Session 3 / Room C: Risks associated with biometric templates in 2D-barcodes in the wild**

Session 3 / Room D: What is an 'authoritative source' when it comes to biometrics?

Session 4 / Room A: User experience in biometrics

Session 4 / Room B: Gimme back my Identity. Now that your Biometrics are captured by Government and Industry, how can you ever regain control?

Session 4 / Room C: Signage? Can Biometric Use be clearly communicated and how.

Session 4 / Room D: When is a Biometric No Longer a Biometric? How do we address risk and regulation for behavioral biometrics, biometrics for diagnostics, and other sensitive inferences.

And here is the defendant that APAC Digital Identity unConference, where, as usual, he played a not-insubstantial but not attention-gathering role in facilitation. This gathering pulled together regional leaders including representatives from the Singapore national identity project, the digital identity initiative of Bhutan, local actors from Thailand, the United Nations, Myanmar, Cambodia, Vietnam, Indonesia, the Philippines, and Malaysia, all to discuss, as engineers and policy practitioners, not vendors, how to work to improve the operations of their respective national digital identity and social digital infrastructures.



Again, what you see here is not someone out at trade shows or chasing blockchain dollars or trying to hustle money, but someone working for social change and social justice. This is the essential character of the defendant for the purposes of 18 U.S.C. § 3553(a).

A key and critical dimension of the defendant's character is his commitment to the essential digital rights of individuals, of which, outside of China, the United States has some of the

weakest. The strongest are those in the European Union. As an admirer of the Nordic Model of social democracy, the defendant was present in Helsinki, at the founding meeting of MyData.org (http://mydata.org) and signed the founding charter and has been perpetually active in the organization.

MyData Global is an award-winning international non-profit that furthers the rights of individuals over their personal data.

What:

MyData is a human-centric approach to personal data management, which combines industry need for data with digital human rights. MyData is an alternative vision which offers guiding technical principles for how we, as individuals, can have more control over the data trails we leave behind in our everyday actions. The core idea is that we should have an easier way to see where our personal data goes, specify who can use it, and alter these decisions over time.

Why?

The fair use of personal data is one of the most critical issues for shaping a sustainable and prosperous digital society.

Personal data has significant social, economic, and practical value. It holds the key to improving a range of services and products provided by governments, companies, and organisations. But personal data-based services must be built on mutual trust.

Today, having personal data stored in your service is a liability. Having permission to use a piece of data is an asset. Companies who grasp this early enough, are in a better position in the newly emerging data economy. Whole industries – such as energy, health and wellbeing, and finance – are already being disrupted by this trend.

The defendant was en-route to speak at the MyData conference in Helsinki after ID4Africa in Nairobi. MyData was to be a stop after traveling to research in Tblisi and Riga. In addition to speaking at MyData, the defendant was working with ex-Nokia executives who were sponsoring data-driven climate change projects in Nigeria, and then was traveling on to another, related conference (http://diceurope.org), and then meeting more business associates at another large vendor trade show in Amsterdam, before meeting with the family in Canada.

The meeting in Canada was not problematic because the defendant's wife had received a 10-year visa immediately after being rejected from Chiang Mai and using exactly the same application materials. Canada, it was agreed, was where the family would say goodbye to the defendant's father because of the belligerent, racism of the United States. The defendant's wife had, and still has, never been denied any other visa beyond the short-term emergency tourist requests for the United States. Recall, she was re-granted the United States visa but it was revoked and the granting officer stated that the revocation was personal and that the 214(b) denial letter he handed her was inaccurate.

All of this work, 100% of what is described above was not about pursuing money, it was about pursuing social change. The character of this work should be clear and should shed some light on the characteristics of the defendant. The defendant is, in a sense, atypical in America in that he does not espouse contemporary American values of transactionalism, greed, selfishness, post-factualism, dishonesty, extreme moral pragmatism, and learned helplessness. Instead, the defendant identifies with the culture of Northern Thailand, in the Zomia[18] region, where there is a

---

[18] From (https://en.wikipedia.org/wiki/Southeast_Asian_Massif#Zomia) - Professor James C. Scott of Yale University used the concept of Zomia in his 2009 book *The Art of Not Being Governed: An Anarchist History of Upland Southeast Asia* to argue that the continuity of the ethnic cultures living there provides a counter-narrative to the traditional story about modernity: namely, that once people are exposed to the conveniences of modern technology and the modern state, they will assimilate. Rather, the tribes in Zomia are conscious refugees from state rule and state-centered economies…. Scott goes on to add that Zomia is the biggest remaining area of earth whose inhabitants have not been completely absorbed by nation-states, although that time is coming to an end. While Zomia is exceptionally diverse linguistically, the languages spoken in the hills are distinct from those spoken in the plains. Kinship structures, at least formally, also distinguish the hills from the lowlands. Hill societies do produce "a surplus", but they do not

strong sense of community, a dislike of excess, an extreme sense of freedom and personal

liberty, and an indomitable commitment to honor.  To that the defendant adds his own beliefs

that it is important to work only to have enough, anything more than enough should be shared

with the community, that one must devote one's talents to the service of others, and that the

singular essential value is integrity of character above all else.  These values are simply

incompatible with modern America and they are demonstrably incompatible with the operation of

the modern American judicial system.  This is based on the defendant's experience and as the

defendant has learned through conflict with counsel and by observing the willingness of the

prosecution to lie and their ability for those lies to go rewarded, in his own, and pretty much

every case he has observed.  Zomia is the defendant's home, and AUSA Warlick, in her zeal,

has pursued a policy that will isolate the defendant from his home, family, and de-facto cultural

identity permanently, in what amounts to an egregious 8th amendment violation.

Thus, in the interests of transparency and honesty, a for-profit company *was* being formed and

launched, and the trip to the ID4Africa conference (and several of the conferences on the

aborted trip) were intended specifically to launch a business which had been newly

incorporated, in Delaware, specifically for the purposes of productizing the "Kasumbalesa

Soution", a set of rapid deployment stations, each of which (below: from the promotional

material)

- *provides* functional biometric identity for up to 500,000 people while avoiding both
    - a central database (strong cybersecurity and abuse risks)
    - a perpetual vendor (diminishment of national sovereignty)
- *defines* a service-driven, self-powering, digital sovereignty which regulates data and
  credential exchange between well known parties -- for example:

use that surplus to support kings and monks. Distinctions of status and wealth abound in the hills, as in the valleys. The difference is that in the valleys they tend to be enduring, while in the hills they are both unstable and geographically confined.[17]

- o   personal health records and doctor/patient digital relationships

- o   labor motility within the community, especially if it crosses national boundaries

- o   cross border law enforcement and national security data exchange

- o   trade facilitation and tax collection, including payment integration

- o   health and education services and facilities

- o   government administration for the community

- o   biometric voter registration and verifiable elections

As the culmination of years of work, each microgrid installation,

- *defines* a self-powering, cryptographically secured, digital service suite. Following the e-Estonian model, the infrastructure for this digital community is procured, installed, financed, legally represented by, and managed by a public/private partnership. This entity is, in effect, digitally sovereign - but, in no way, physically sovereign.

- *digitally transforms* communities through the deployment of green power generation, managed 5G, as-needed functional architecture, and combat-vetted secure micro-data centers. The data centers support the regular migration of local community needs from paper based to biometrically bound e-Government processes.

- *engages* nearby communities, national digital systems, as well as civil society, regional and international organizations. For example, the UN-IOM MIDAS adapter and the UNHCR PRIMES adapter ensure the community is prepared for engagement - for example, when a disaster strikes nearby and your Microgrid helps rapidly absorb the social pressures.

- *enhances* the human condition where best-practices and civil society are already part of the legal firmament but where natural, technical, or civil society infrastructure is lacking.

- *protects* border regions by establishing *critical health parity* on all sides of a border, transparently sharing health data in accordance with leading-practices in personal data

management, privacy, and resistance to misuse, while enabling rapid integration with
pandemic and epidemic management software.

- *stabilizes* border regions by providing a point of mutual interest in the event bordering
nations engage in conflict.

The solution reduces the risk of future crises by facilitating incremental digital transformation and
strengthening communities in challenging multistakeholder environments such as remote
borders & ports, municipalities, and small island developing states.

This is an aerial view of the deployment location, and the position of the location in Africa.

 

Then there is the work that the defendant was pursuing in Ethiopia, Senegal, Congo-Brazzaville, the Saudi NEOM project, and a particularly interesting suite of work the defendant was pursuing in Seychelles. Travel documentation and communications seized by Agent Corey Zachman record meetings and efforts regarding the substantial Ethiopian national ID effort, which was seen as a flagship within the broader African Union. The work in the Seychelles, which involved multiple trips including the defendant and his wife, which happened to travel through Ethiopia (there is a direct flight from Bangkok to Addis Ababa), was investigating the possibility of establishing an agricultural exchange between Seychelles and the agricultural universities in northern Thailand (Chiang Mai University and Mae Jo University) since

1. there is a Thai/Seychelles friendship garden in downtown Victoria and existing, substantive diplomatic ties, and
2. the flora is substantially similar, and
3. both environments have soil development and retention problems due to rains,

so the composting and permaculture solutions are directly translocatable and amenable, with potential to draw United Nation's "Blue Economy" funding specifically because the overuse of fertilizer on the limited arable Seychelles land damages the reef ecosystems and the inability to efficiently produce local produce means that imported vegetables in service of the tourist economy exacts and enormous carbon footprint.

Again, these concerns, considerations, and efforts speak of someone who is extremely active, and extremely dedicated to matters of social justice in the world. The defendant's character is not typically American in that he is not self-centered, focused on the acquisition of material goods, focused on a transactional approach to life (e.g. but what do *I* get for it), and is pretty much out there working obscenely long hours, on an obscenely large number of projects, all devoted to the betterment of humanity.

All of this work was shut down and the vast majority of it was permanently canceled specifically so that AUSA Lori Warlick and AUSA Gregory Radics could ensure pre-trial detention. This pre-trial detention was secured on what amounts to entirely false statements.

- Almost no statement in D.E. 15-4, the government's motion for pre-trial detention was accurate
- AUSA Warlick destroyed the passport evidence refuting the lies regarding passport revocation, travel and visa status, which were attempted as late as the Pre Sentence Report
- There is documented evidence of an anti-flight risk (efforts to surrender)
- There is documented evidence of severe efforts to re-hold the detention hearing and documented evidence of initial counsel Christian Dysart acting unethically and in the interests of his own convenience in squelching the detention hearing - and there is evidence that this conflict was used to attack the defendant's mental capacity in the form of movement for 4246 civil commitment due to inability to work with counsel
- There are substantial inaccuracies in the pre-trial detention hearing which the defendant could not overcome due to
  - Threats made by Judge Regina Canon
  - Medical incapacitation at the time of the Detention Hearing

It is now patently obvious that a configuration of home-detention followed by a requisite prison sentence in satisfaction of the statutory requirements of 18 U.S.C. § 3553(a) relative to the violation of 18 U.S.C. § 115 would have satisfied the ends of justice.

With that in mind, let us consider all of the defendant's work and reflect on AUSA Lori Warlick's words (D.E. 77 31: 16-25, 1-5)

I'll note, Your Honor, just responding quickly to the fact that his father is ill. Again, I have no reason to doubt that and my understanding is that he is ill, but he's had this condition for -- he's been terminally ill for some years, and Mr. Welton did not come and help him then. He was -- he sought to bring his family to -- with him to Iowa to see his father because they were fearful that he might pass away. His wife was not granted a visa, and that was one of the issues that the defendant had and led to the subsequent -- the second charge, which was the threat on any Marines that might be staffed at the consulate there at Thailand because the consulate is the one that denied him – his wife the visa. But Mr. Welton could have traveled back and seen his father. He chose not to. Instead, he went traveling for work and did other things.

And let us review the facts:

- The defendant learned of his father's terminal illness in 2020 and that was the singular reason why, against all other indications, the defendant traveled to the United States at that time
- The defendant has a pathological dislike of the United States such that returning there makes him physically ill because it triggers some sort of "PTSD-like" mental health crisis, so being in the United States itself is fundamentally difficult, especially during periods of authoritarian and fascist uprising (e.g. Trump presidencies)
- The defendant video conferences remotely with his father every day (because the defendant uses VoIP exclusively, instead of Phones)
- The threat against the marines was not directly do to the denial, it had to do with the fact that his daughter was threatened, his wife was mistreated, and the consulate, and several other agencies, refused to acknowledge that fact or respond appropriately
- The defendant was 'traveling for work' in the form of launching a *substantial* social benefit project aimed at making a *substantial* humanitarian impact in the global south

- The goal of the company was not 'to make money and get rich' (the crass American dream), but to support the people and extended community that depended upon him
- The Embassy later confirmed, as did *every immigration attorney* that the Chiang Mai consulate was *in error,* had behaved inappropriately, and was pursuing a personal vendetta

None of the above justifies making drunken, pill laden, threats against a bunch of Marines or getting fed up with the constant drone of messaging about how the free and fair 2020 election was stolen from Donald Trump. The defendant admits that the fact of the 18 U.S.C. § 115 transgression remains. However, absolutely none of AUSA Warlick's supporting arguments, nor any of AUSA Gregory Radics' arguments, both in the detention hearing and in D.E. 15-4, are sustainable. The path of destruction left behind by AUSA Gregory Radics and AUSA Lori Warlick can only be described as a drunken, pill-laden bull wandering backwards through a china shop, or, in legal parlance, gratuitous 8th amendment violations.