THE ISSUES OF 2012-2015 - THE MENTAL HEALTH DIMENSION

A key component of O'Connor's Sentencing Memorandum describes the tumultuous and temporary immigration of the defendant's family to Portland, Oregon. At the time the defendant was associated with several technology companies based in the Pacific Northwest. At the time the defendant's mother was still alive and the family hoped that the defendant's wife and daughter might benefit from some time living in the United States and spending time with the grandparents and inlaws.

The description of the 2012-2015 events in the O'Conner document under-represents the scale and scope of the cultural clash between the family and the federal and local governments. Not all of the painful interactions are enumerated, nor were the problematic timings highlighted, nor is a detailed account appropriate in this venue. That period of time can only be described as a relentless cascade of catastrophes mediated by a hostile, depersonalized and dehumanizing government. In contrast to other governments, with which the defendant and his family have experience, the United States government, from the federal to the local level, uniquely lacks the capacity to operate with common sense and human decency. American governance and culture actively promotes a posture of helplessness and a mentality of enslavement directly contrary to the values publicly espoused by the most vigorous defenders of American exceptionalism. The recent hijinks of DOGE have tapped into one vein of hatred for this over-bureaucratization of American life. Lawyers and authors like Philip K. Howard, whose books *The Death of Common Sense (1995)*, *The Collapse of the Common Good* (2002), *Life Without Lawyers* (2009), *The Rule of Nobody* (2014), *Try Common Sense* (2019), *Not Accountable* (2023), and *Everyday Freedom: Designing the Framework for a Flourishing Society* and his organization *Common Good* represent more mature efforts along this same line. Hyperbureaucratization is not an inalienable fact of life.

While talking to European counterparts, specifically counterparts in Democratic Socialist

countries, namely countries with extremely healthy democracies, vibrant economies, and whose

populations routinely rank amongst the most mentally healthy on the planet, a common refrain is

the disdain and distrust that Americans have for their government, their continual sense that

their government is failing them, and their belief in their alienation from their government. This is

in contrast to the social democracies where the role of government is seen as the vehicle by

which the body politic realizes their common enterprise, such as the provision of universal health

care, universal education, solid infrastructure for roads and public utilities, and a general safety

net so that the society is strengthened by ensuring it does not rot from the bottom. Because the

defendant finds some sensibility and political alignment with these several tens of millions of

other, democratic and economically thriving world citizens, he is, nevertheless, demonized by

the Eastern District of North Carolina, as a Socialist with the specific intention of offering that as

an explanation for why he would engage in aberrant behaviours such as violating 18 U.S.C. §

115.

Thus, after years of happy freedom without the hellishness of the collapsing "3rd worldism" of

American social infrastructure, the defendant and his family experienced profound cultural shock

when relocating to the United States. This was a key factor which contributed to the animosity

felt by the defendant towards this country and the decision by the defendant and his family to

reverse their immigration efforts permanently. The dehumanizing hostility of American

institutions is shocking to those who are not indoctrinated or Sovietized to the culture of Learned

Helplessness that defines the modern American citizen experience.

Here is an example that is a subject of the defendant's nightmares. Citizens submit documents

to the State Department in the federal building in downtown Seattle, where the hoi polloi slide

envelopes to government overlords through slits in a bullet-proof barrier, in a windowless room,

with gun-toting men at their backs, after having passed through a full body screening. After

submitting paperwork in this dehumanizing and degrading fashion, should a hospital suddenly need a submitted original document *the very next day*, it turns out that there is no way for a citizen to make a phone call into that building and recover that document, because direct citizen telephony is considered a national security risk. Phone calls into windowless rooms must take a mandatory 14 days and get routed through the official National Passport Information Center communications hub - which operates out of a strip mall in Sterling, Virgina. In Seattle, you can not simply point at the building and say "I need the green card I just handed to someone in that building" - asking that requires a 14 day electronic messaging protocol via strip malls in Sterling, Virgina, for your safety, because, apparently, the men with guns and the full body pat down and the windowless chambers and the bullet proof windows are not enough.

The inability to say *"I handed you this document yesterday, now the hospital needs it all of a sudden, may I please cancel this paperwork and get my documents back for the hospital"* can, and did, have life threatening implications.

As another example, the defendant, when working in Saudi Arabia, grew tired of the security theater and histrionics of the American Diplomatic Mission. It was so onerous to obtain citizen support from the United States that the defendant applied to immigrate to New Zealand. Thus, when the defendant needed, for example, the government stamp required to process a car rental, he was able to simply walk to the citizen services desk at the New Zealand embassy in Riyadh and, in a matter of minutes, obtain the stamp required. This involved walking in to the New Zealand Embassy, passing through a light security service, approaching a woman at a desk, handing her some paperwork, obtaining the stamp, and returning. The same process via the United States involved a multi-day scheduling process with several poorly integrated automation steps, fee payments, justifications and counter justifications, documentation proving citizenship and necessity, and then involved multiple layers of invasive security screening, before approaching a person on the other side of a bullet proof window, in a windowless room,

with gun toting men at your back, while you did the document exchange through a slit in a bullet proof window. Sometimes it was just embarrassing to be American. The New Zealand Embassy was no less secure, they just were not silly about it. New Zealand felt proud, brave, and human. America felt silly, histrionic, and cowardly.

Consider again the situation where the defendant attempted to re-acquire his daughter's I-551 from the Seattle federal building. In this context the government had provided another catch-22, such that the pathway to accessible health care meant denying access to health care, requiring him to take his family to another country in order to access a hospital, and thus he required the immediate return of the I-551 when his wife collapsed and could suddenly no longer stand.[19] Based on the proceedings recorded by this Honorable Court and the position of AUSA Lori Warlick as a representative of the interests of the People of the United States, the defendant understands that it is the position of the Attorney General's office and thus of the United States, that, to quote AUSA Warlick (D.E. 77) citizens should adopt a posture of "it's just the way it goes" and, we should not be bothered because, to quote U.S. Senator Joni Ernst "We're all gonna die."[20] However, especially when their loved one's lives are threatened just because the government refuses to hand them a document, they do not readily adopt the wisdom of Warlick's

---

[19] In Oregon, at that time, as O'Conner writes, the defendant and his family were enrolled, against their will and wishes, in a state sponsored insurance program. This enrollment was mandatory because their insurance was not recognized nor was the state able, at that time, to verify the foreign tax information due to the defendant's overseas self-employment. Thus, while the defendants were able to pay for health services, it was illegal for health care providers to provide health services to either the defendant's wife or daughter as they were I-551 holders of less than five years, an immigration category specifically disallowed by the state program in which they had been enrolled against their will and wishes and from which it was not possible to unenroll until they had been resident within the state and produced tax filing data for at least 9 months. As they were informed, they were "chinks in the system" and were, quite literally, being "helped to death" The only option open to the family, at that time, was to receive health care in another country, making the first year of Obamacare the most expensive health care year for the family on account of the airfare. During this time the Chiang Mai consulate was unwilling to assist with the management of I-551 travel documents or accessing the I-551 which was lost to the State Department, of which the Chiang Mai consulate is a part, since allowing the citizens to contact the State Department directly is considered a national security risk.

[20] Most efforts to deal with the complexities of the health care fiasco were handled with this sort of pithy, "just give up" and "that's not true" denialism. While it is tempting to bury one's head in the sand and pursue the comforting logic of System's Justification Theory, pretending a problem does not exist and wishing it away does little to actually solve the problem. Almost all federal representatives, when confronted with these bureaucratic gordian knots, tend to adopt postures of Warlickian belligerence.

and Ernst's "oh well, just give up" attitude. Some people might even consider this Soviet-style hyper centralized bureaucracy, and the Warlick/Ernst attitude of Chinese-complacency particularly un-American.

The defendant agrees that threatening people is not acceptable but the defendant does not agree that the alternative, the adoption of a posture of supine helplessness and a wanton tolerance of social abuse and institutional dysfunction, as promoted by AUSA Warlick and the United States government, is likewise acceptable. Just as it is unacceptable to threaten people, it is unacceptable that we require legal action to convince people, such as the IowaGOP, the North Carolina GOP, or the United States Consulate, to behave with simple human decency.

Without quoting all of O'Connor's synopsis, let us review the key elements, of 2012-2015:

- The family, starting as early as 2011, was engaged in constant struggles with numerous facets of government banality, during an attempt to temporarily immigrate in order to spend time with US-based family

- The immigration turned into repatriation in 2015/2016, with the family returning to their home in Thailand, concluding that their time in the United States had been a mistake

- The defendant spent no less than 30 hours / week, during the entirety of that time, devoted solely to defending his family from negative, and wholly impersonal, government interaction, including

  - The refusal to allow the family to access medical treatment in the United States due to a bizarre and complex interaction of state and federal laws revealed during the botched bootstrapping of the Obamacare platform in Oregon. This only impacted people with a very specific constellation of life circumstances, such as

the defendant's family, and, according to Senator Jeff Merkley's office, the
defendant's family were unfortunate "chinks in the system"

○ The Chiang Mai consulate effectively forced the family to abandon their daughter
in the United States during critical weeks at the start of high school because of
papers lost to the State Department - see above example. The documents could
not be retrieved from the Seattle Passport office because it was not possible for
citizens, or the consulate, or congress, to contact the federal building as a matter
of national security

○ The IRS made efforts to force the family into homelessness in order to pay a
pre-emptive tax on potential future earnings[21]

○ Numerous issues relating to the battle for adoption and then citizenship, all of
which were handled by the defendant, operating pro-se, and upon a commitment
to the belief that citizens should not be isolated from their governments through a
layer of attorneys but rather that they can, and should, have direct access to the
means of effectuating the conditions of their lives via the courts

  ■ A particular telling example is where the state department repeatedly
  asked for more documentation supporting one point of particular.

  ■ The defendant continued to return the same documentation, along with a
  photocopy of the immigration and naturalization act, adding a new color of
  highlighter to indicate the relevant passages each time

---

[21] The requirement, in law, is to liquidate all of your possessions today in case, in the future, you might
make money and be liable for tax that you would then have paid by virtue of having liquidated all of your
possessions and moved into a homeless shelter. This is an actual law, and yes, the defendant did
consult with tax officials - avoiding this fate is what took hundreds of hours of paperwork.

- After three colors highlighting the regulation, the documentation was deemed sufficient - the originally submitted documents, which satisfied the law, plus three colors of highlighter were accepted.[22]

o Numerous state and local issues relating to automobile permits

- Example 1: it took over 1 year to secure a driver's license, due to an $11.00 accounting mistake related to the Nevada DUI noted in this court record. Records caught in a 'system's upgrade' prohibited this from being paid.

- Example 2: it took over 1 month and phone calls to 6 agencies to determine that no one in the State of Oregon could determine whether or not it was legal for a citizen to drive on a foreign license, or for how long although they could determine the duration of time a foreigner could drive on a foreign license.

- Due to the above, after a few dozen hours of working with state police, local police, the department of motor vehicles, the department of transportation (different), and the mayor's office of Portland, the decision was made, in consultation with law enforcement, that the sensible action was to drive without a license and to pay associated fines, all while attempting to pursue a license as soon as possible

o And *dozens* of other issues, not presented

---

[22] In later communications the State Department insisted that new documentation had been provided with each request, allowing the process to move forward. The State Department can not identify the documentation thus provided.

All of these are examples of what Americans have grown accustomed to because Americans have grown to accept poorly functioning social infrastructure because they have embraced the culture of Learned Helplessness promoted and celebrated by conservative fatalists like AUSA Lori Warlick. Progressives and liberals, such as the defendant, struggle for social justice to improve the character of the nation and of our society. So while

- threatening people is not ok

neither is

- harming people with persistent requests to fund the overthrow of a legitimate government, or
- threatening to deport someone because of their ethnicity

Both of which are being tacitly sanctioned by the state by refusing to correctly document the characteristics of the offense as per 18 U.S.C. § 3553(a).

Let's return to the topic of O'Connor's summary of the 2012-2015 events, which led to the mental health issues which are incorrectly characterized throughout this case. To be clear, the problematic issues described above were on top of all other issues involved with raising a family, including working full time, caring for a child, relocating to a new country, coordinating with the broader U.S. based family (including illnesses, deaths), and so on. Each one, of its own, is frustrating, but what marks the 2012-2015 episode was the intensity, focus, and relentlessness of their occurrence at a time of culture shock. In their fullness and in union with the rest of the events of their lives, which is not recounted here in its entirety, the experience was devastating to the family and specifically damaging to the defendant.

As a result of the experience of 2012-2015, the defendant returned to Thailand, where

- life simply did not have the extreme pointless complexity,

- there was a higher level of government services provided for a lower level of taxes, and

- the level of freedom and quality of life was, in many ways substantially higher.

During this time the defendant continued to seek counseling for what amounted to extreme Anti-Americanism and anti-american burnout, and for what had manifested as a set of "PTSD-like" symptoms, which included

- prolonged and thematic nightmares,

- long periods of intrusive thoughts,

- claustrophobia (most dramatically involving mini-vans, but also occurring more broadly [e.g. planes, images of people in caves, thoughts of closets]),

- severe and measurable adrenal response to doorbells and ringing phones, and

- an assortment of other pathologies centered around the hypothalamic-pituitary-adrenal axis.

Bouts of these symptoms were distinctly triggered, which is why this was discussed with counselors and people with clearly diagnosed PTSD as "PTSD-like". This has gotten shortened, throughout the course of all of the court documents as "PTSD", when, in fact, it is, more accurately, "a set of PTSD-like pathologies that are reliably triggered by a category of stimuli"

We will later see how this clarification plays into the case regarding:

- The physiological harm motivating the request to block communication, and the aggressive misrepresentation of that by AUSA's Radics and Warlick

- The mishandling of the 30-May-23 Detention hearing and multiple unchallenged misstatements by AUSA Radics

- The efforts by AUSA Warlick to secure punitive 4246 civil commitment

- The medical mismanagement resulting in forced sleep deprivation of the defendant for four months, forced overdosing of the defendant, forced confinement of the defendant in

a pile of another man's feces, and other diminutive effects resulting from AUSA Warlick's punitive efforts

What is important to understand, in terms of the goals of 18 U.S.C. § 3553(a) , is that the defendant experienced something that left the defendant with a set of psychological scars. There is evidence, in the form of medical documentation of encounters with trained professionals, ranging from Portland, Oregon through to Chiang Mai and Pai Thailand, and throughout the documentation obtained by FBI Agent Corey Zachman, regarding the impacts and effects of this. This exists independent of the instant offense and can be empirically verified. The primary obstacle towards assembling this documentation have been the facts of pre-trial detention and the unwillingness of counsel to so engage.

In the context of this case a great deal of confusion has been introduced regarding "the defendant's PTSD," whether it is "self-reported" or "illusory" or some attempt to curry favor or leniency, or even how exactly it applies to USSG §5H1.3 and/or USSG §5K2.13, which was the defendant's original consideration. This situation has an important part to play in the events, but it is not the case that "the PTSD made him do it", instead:

- Issues related to the specific mental health of the defendant, without specific requirement of a diagnosis, refute the unwarranted attempts at character assassination and frankly, the unnecessary personal insults, provided by both AUSA Radics and AUSA Warlick

- The fact that the defendant was undergoing a mental health crisis which was amplified by intentional and targeted digital harassment means that the stalking was having a specific, measurable, and substantial dangerous physiological impact such that it is reasonable to consider the defendant's request to be left alone as a matter of medical necessity rather than an issue of purely theoretical first amendment rights

The extreme animosity towards the consulate regarding their refusal to either apologize or to submit the offending officer for civil or criminal prosecution must be understood in the context of a response to a direct triggering of the above. As we will see, there is absolutely no truth, whatsoever, to the concept that the defendant was concerned about visa denial - visa denial was never, in any way, relevant to the conduct in question